Jacob Markowitz, J.
Motions numbered 39, 40, 42, 43 and 62 of June 22, 1964, are consolidated with motion No. 41 of the same date.
*959 Pursuant to section 298 of the Executive Law, the State Commission for Human Eights has brought this proceeding seeking enforcement of its order affecting employment practices[1] in the sheet metal industry. The order of the commission, in essence, found that the respondent union, Local 28 of the Sheet Metal Workers International Association of Greater New York (hereinafter referred to as “ Local 28 ”), and the Joint Apprenticeship Committee[2] (hereinafter referred to as “ JAC ”) denied to or withheld from qualified Negroes and other minority groups the right to be admitted to and participate in the sheet metal apprentice program, under their control, solely because of race and color. The order further found that the individual respondents herein, who are employer members of the JAC, aided and abetted the other respondents in denying qualified Negroes the right to enroll in the apprenticeship program. By separate motions, Local 28 is seeking review of said order, and the individual respondents seek to set aside said order as it affects them individually.
*960 The commission found that Local 28, consisting of 3,300 members and 430 apprentices, has never had nor does it presently have a Negro member, nor has any Negro participated in the JAG training program. The only realistic way of becoming a member of Local 28 is through the JAG program. The commission further found that, in the most recently completed training program, 80% of the trainees were related in some manner to the members of Local 28. The commission also found that admission to the apprenticeship training program was not based upon any set of objective standards. No provision existed safeguarding any applicant against discrimination because of race, color, creed or national origin. Nor was there any provision entitling an applicant to seek review of a rejection of his application for training.
The court concludes that the findings of the commission, except as hereinafter noted, are supported by substantial evidence on the record considered as a whole. The findings are therefore conclusive (Executive Law, § 298; Matter of Holland v. Edwards, 307 N. Y. 38, 44, 45; Matter of Stork Restaurant v. Boland, 282 N. Y. 256, 274). The enforcement procedures set forth in the commission’s order thus are the remaining issues for consideration.
The court approaches this matter not simply as litigation between private parties, but rather views the instant proceedings as raising vital matters filled with greatest public concern. The issue herein, involving the development of nondiscriminatory shop-training programs, cannot be approached strictly within the conventional confines of an adversary proceeding. The people of this State, as well as groups throughout the country, are searching for guidelines in the handling of this volatile problem. To that end, the court enlisted the co-operation of the parties.
The court arranged conferences with all parties and governmental agencies concerned, in the hope that the desirable objectives might be achieved by conciliation and agreement rather than solely by force of law.2a Numerous and extended conferences were held throughout the Summer in an attempt to achieve the adoption of acceptable standards for an apprentice ~training *961 program which would carry out the spirit and the intent of the law against discrimination (Executive Law, art. 15) and the principles of equality which are fundamental to both our Federal and State Constitutions and systems of law. Represented and participating at the conferences were the commission, the employers, the union officials involved, the Industrial Commissioner and the Attorney-General. From time to time each of the parties requested a conference with the court, jointly or severally, while the standards for the joint apprenticeship program consonant with the court’s directions were being formulated.
From the inception of these proceedings and conferences, the court advised the parties that it could not recognize any plan as acceptable unless it truly afforded every applicant for admission to the apprenticeship program equal opportunity, nor would any plan be approved that did not abolish the existing practice of favoritism because of family affiliation, or did not provide for a complete and fair review procedure, or made it economically difficult for an applicant to qualify, or incorporated unreasonable educational requirements, or which in any other way would prevent equal opportunity under objective standards or selection on any basis other than the basis of qualification alone.
The court recognized that the issue before it involved the foundations of our democracy. Judicial decisions,[3] legislative enactments[4], and events in the world outside the courtroom demonstrate that today’s crucial testing ground for the American system of democracy is in the area of equal rights for its Negro citizens. Equality for our minority groups — the right to equal job opportunity, .the right to equal educational opportunities, the right to equal housing opportunities, and the right to vote — is the essence of democracy today. Without it our democracy falls short of securing fundamental human rights for all citizens. Unless every citizen enjoys all the rights of freedom, our democracy becomes anemic. Anemic democracy is nonexistent *962 democracy. There must be a moral awareness and a greater concern for human rights and dignity and the dignity of man. Industry, labor, government at all levels, and the public at large must embrace this basic concept.
The legal profession has recognized the urgency of achieving racial equality in conformity with law and order.[5] As President *963 Johnson has recently said: “ The denial of rights invites increased disorder and violence and those who would hold hack progress toward equality and at the same time promise racial peace are deluding themselves and deluding the people. Orderly progress, exact enforcement of the law are the only paths to an end of racial strife.” (Address to the American Bar Association, Aug. 12, 1964.)
There is perhaps no right more important for the achievement of equality than the right to learn how to perform a job. The Court of Appeals has recently noted that discrimination in employment, with its consequent economic disparities upon which other kinds of discrimination thrive, is the ‘ ‘ main key ’ ’ to the problem of ending discrimination based on race and creed. (Matter of Board of Higher Educ. of City of N. Y. v. Carter, 14 N Y 2d 138.)[6] Denial of the right to be trained in many industries is tantamount to denial of employment. Discrimination based upon race which effectively excludes a minority from the right to be employed in a particular industry has been condemned by the courts. (See, e.g., Kelly v. Simons, 87 N. Y. S. 2d 767, 770; James v. Marinship Corp., 25 Cal. 2d 721 [1944]; Todd v. Joint Apprenticeship Comm., 223 F. Supp. 12, revd. on other grounds 332 F. 2d 243 [1964]; cf. Gaynor v. Rockefeller, 21 A D 2d 92, 100.)
Independent of judicial precedent, this court enunciates the principle that it will not countenance discrimination in job *964 training programs which exclude the victimized minority from employment in industry. As noted above, consideration of the issue herein must realistically acknowledge the keystone position of equality in job opportunity (and as a prerequisite thereof equality in job training and apprenticeship opportunities)[7] for achievement of full equality required in our democracy. The best schooling in the world can lead only to frustration if it does not lead .to a decent job; equal access to the best restaurants or residential areas is meaningless if there is no money to pay the going price; full right to participate in public life is small comfort if one’s private life is impoverished.
The court notes that the history of the American labor movement reveals a continuing concern by its major branches and spokesmen for .the achieving of equality for all.[8] The concern of American labor for equality has increased with the passing years. Particularly relevant to the instant case has been the attention that the labor movement has given to the problem of discrimination in apprenticeship programs. George Meany, President of the AFL-CIO, declared before a Special Subcommittee of the House Committee on Education and Labor in 1961:[9] “ What we need in this country is genuine equality of opportunity for all citizens regardless of race, creed, color or national origin. Let’s grant that apprenticeships are a prob *965 lera; fine, let’s act on that problem. But apprenticeship is only a part of a much broader problem. ’ ’[10]
In June of 1963,[11] the general presidents of the unions affiliated with the Building and Construction Trades Department, AFL-CIO, adopted a program which included the following provision: “4. With regard to the application for, or employment of apprentices, local unions shall accept and refer such applicants in accordance with their qualifications and there shall be no discrimination as to race, creed, color or national origin
Nevertheless, discrimination does exist.[12] It is with the effective and wise eradication of the manifestations of unwarranted prejudice in the apprenticeship program in the sheet metal industry in the City of New York that this court is concerned in the instant proceeding.
With respect to the plan proposed, Local 28 made a forceful presentation in favor of attaching some preference to those applicants who are sons or sons-in-law of present or deceased members of the Union. The court recognizes that the practice of giving some preference to applicants with filial ties to union members is widespread and dates back to the very inception of craft unions when craftsmen first joined together in guilds. The historic, economic and social reasons for the practice of filial preference and its beneficial effects have been urged by the union and examined by the court.
Under the realities of today’s society, the guarantee of equal protection of the laws and the prohibition against discrimination *966 contained in section 11 of article I of the New York Constitution requires that this court refuse to sanction any plan which could be used, directly or indirectly, to discriminate against any person on the basis of race, color, creed or national origin. The 1964 amendments to the Executive Law and Labor Law apply this principle■ directly to the area before the court — apprenticeship training programs. ■ The court concludes that provision in this apprenticeship training program for preference or credit because of filial relation would be illegal and unconstitutional and so advised the parties and the Industrial Commissioner.
In addition to the overriding constitutional and legislative declarations of equality, the court believes that filial preference is contrary to modern day societal objectives concerning job qualifications.. No lawyer or doctor today would expect his son to receive preference by reason of family relationship in applying for admission to the Bar or for a medical license. Admission to a profession or industry based exclusively upon the applicant’s qualifications to perform in the profession or industry as determined by objective criteria-is to be encouraged.
The court was also concerned that the original proposed plan did not provide for. adequate review procedures to an applicant, and directed appropriate amendments.
In the fourth completed draft, the parties submitted a new plan whereby an applicant, after he has exhausted his right to review before the Joint Apprenticeship Committee, may obtain further review by a member of a panel chosen by the Presiding Justice of the Appellate Division of the First Department. After consultation, the Presiding Justice graciously consented to perform this function.
The court was also concerned with the fact that educational standards higher than were reasonably necessary might be adopted. To this end, the court suggested a graduated system which would be fair to minority groups and at the same time discourage high school drop-outs, while nevertheless meeting the minimum scholastic requirements for an apprenticeship trainee. Under the court’s suggestion, an apprenticeship trainee for the 1965-66 programs would be required to have completed two years of high school work or its equivalent; for the 1967-68 programs, a three-year requirement or its equivalent would be necessary, and thereafter a completed high school course or its equivalent would be mandatory. The plan as finally adopted is sufficiently flexible .to meet these suggestions, and if need be will be supplemented in the final order of the court.
*967 The question of applicant fees was also considered. In order to avert an economic barrier, it was urged by the court that such fees be kept to a minimum or even eliminated. However, it is recognized that administrative and medical examination costs might make it necessary to require an apprenticeship applicant to defray some of the expenses. Accordingly, the accepted plan adopted a provision whereby such cost would never exceed the amount of $10.
The problem pertaining to the 430 individuals on the present apprenticeship list was resolved by providing that they and all other applicants shall be accorded equal treatment in determining their eligibility to be appointed to the apprenticeship training program and be judged by the same set of objective standards. Further, it is provided that no preferential treatment shall be given to either those who apply for admission de novo or those who have applied heretofore.
Another question which remained before the court is whether the individual respondents acted as individuals or solely in their representative capacities. This is important in view of the possible sanctions. Were it not for the complete co-operation given by all of the individuals to the establishment of a nondiscriminatory joint apprenticeship training program, the court might well have found that the record was susceptible of sustaining the finding holding the individuals responsible in their individual capacities as well as in their representative capacities. The court, however, is not unaware of the private economic and social forces that operate to compel individuals to follow the course of least resistance, frequently on the theory that it is only committee responsibility and not individual responsibility which they assume. In a situation such as the present one, none of the employer members of the committee receives compensation for his services, nor do they as individuals benefit from the committee responsibility which they carry out. The court recognizes that industry/union committees are desirable, if not vital, to the harmonious working out of industry-wide labor problems. The court is convinced that the individual respondents are in favor of the underlying theory of equality of opportunity in job training. The court finds' that the representatives of industry and labor act both in' their individual as well as in their representative capacities. However, under the circumstances of the entire case, the court will not affirm those findings of the commission against the individuals themselves as to their prior conduct and past acts.
There were other difficulties and problems presented by the original and intermediate plans which need not be gone into in *968 any further detail. The final plan (fourth completed draft) presented by the Joint Apprenticeship Committee and approved by the commission is set forth in full in Appendix “ A ” to this decision.
In addition to the matters heretofore alluded to, the final plan generally provides for the selection of apprentices without regard to race, creed, color, national origin, or physical or psychological handicaps provided the latter two do not interfere with the applicant’s ability to perform. Apprentices must be selected on the basis of qualifications alone, and all applicants will be afforded equal opportunity under the adopted standards. A rejected applicant is to be notified and the reasons given therefor with the right to appeal. A rejected applicant may reapply. The age prerequisites are 18 to 23 with some modifications. Medical and physical examinations are required. Aptitude tests are to be given by the New York City Testing Center or equivalent testing center. Two hundred per cent of the number of apprentices ultimately to be appointed who have achieved the highest rating in an independently conducted aptitude test will be interviewed. The interviewing board is to consist equally of representatives of labor and industry. The maximum point score one can achieve on the test will be 750, and on the interview 150. Appointments will be made solely and exclusively on the point score. The term of apprenticeship will be four years (approximately 7,000 hours) of reasonably continuous employment, divided into eight periods. On-the-job instruction will be given in specified areas, and trainees will be required to attend formal classes one day every second week with pay. Tuition fees for such instruction are provided for, as well as periodic examinations. The plan annexed hereto also embodies other aspects. Not specifically included in the plan, but agreed to by the parties is a requirement for publicizing the program in the schools and through other channels and media making it clear that it is open to all who are interested and can meet the objective standards. The publicity requirements will be incorporated in the order to be settled hereon. The next apprenticeship class will be in January or February, 1965, and be under the plan adopted herein.
The plan herein adopted was the result of the unusual co-operative spirit on the part of the commission, industry, union officials, their respective counsel and the Attorney-General. The court expresses its appreciation to the aforenamed parties. The court accepts the plan because it is enlightened, progressive and in accordance with the principles of nondiscrimination. *969 equality of opportunity and on the basis of qualification alone under objective standards.
It is hopefully expected from the effective implementation of this program a truly nondiscriminating union will emerge. A rare opportunity is afforded to this industry to serve as a model for others, and, by rigid adherence to the adopted standards, itself become a standard of morality and brotherhood, equal opportunity and democracy.
The objective standards herein adopted for the apprenticeship program in the sheet metal industry of New York City may well be a model for State-wide utilization by the New York State Industrial Commissioner, who is mandated[13] to promulgate rules and regulations implementing chapter 948 of the Laws of 1964.[14]
In summary, the commission’s findings and affirmative provisions of its order are adopted except as to finding No. 66 as modified and as to the cease and desist order by striking the second decretal paragraph as heretofore indicated in this opinion.
At the request of the parties, the court is retaining jurisdiction. An interim order including findings consistent with this opinion will be settled hereon.

. Proceedings herein were commenced by complaint of the Attorney-General of the State of New York to the commission, pursuant to section 297 of the Executive Law of the State of New York. The complaint charged violation of section 296 (subd. 1, par. [b]; subds. 1-a, 6) which provide:
“ § 296. Unlawful discriminatory practices. 1. It shall be an unlawful discriminatory practice: * * *
“ (b) For a labor organization, because of the age, race, creed, color or national origin of any individual, to exclude or to expel from its membership such individual or to discriminate in any way against any of its members or against any employer or any individual employed by an employer.
“1-a. It shall be an unlawful discriminatory practice for an employer, labor organization, employment agency or any joint labor-management committee controlling apprentice training programs: * * *
“ (b) To deny to or withhold from any person because of his race, creed, color or national origin the right to be admitted to or participate in a guidance program, an apprenticeship training program, on-the-job training program, or other occupational training or retraining program;
“ (c) To discriminate against any person in his pursuit of such programs or to discriminate against such a person in the terms, conditions or privileges of such programs because of race, creed, color or national origin. * * *
“6. It shall be an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article, or to attempt to do so.”
The order of the commission was issued in conformity with section 297.

. The Joint Apprenticeship Committee, containing equal union and employer representation, was created by the parties to supervise and control all duly qualified apprentices. It is required under the Standard Form of Union Agreement, the collective bargaining agreement governing the industry, to formulate and make operative rules to govern the conditions pertaining to duly qualified apprentices and the operation of an adequate apprentice training system.

. This is in keeping with the spirit of the law against discrimination, which, rather than providing for the usual procedures for review of administrative agency determinations (see CPLR art. 78), has incorporated provisions giving the Supreme Court complete jurisdiction of the proceeding and the power to grant such temporary or permanent relief as it deems just and proper (see Right to Equal Treatment: Administrative Enforcement of Antidiscrimination Legislation, 74 Harv. L. Rev. 526 et seq.).

. See, e.g., Brown v. Board of Educ., 347 U. S. 483 (State imposed segregated public schools); Shelley v. Kraemer, 334 U. S. 1 (racial restrictive covenants); Burton v. Wilmington Park Auth., 365 U. S. 715 (restaurant); State Athletic Comm. v. Dorsey, 359 U. S. 533 (athletic contests); Terry v. Adams, 345 U. S. 461 (political organization primary); Gomillion v. Lightfoot, 364 U. S. 339 (geographic redistrieting of municipal voting areas); Johnson v. Virginia, 373 U. S. 61 (State compelled segregation in courtroom); Conley v. Gibson, 355 U. S. 41 (discrimination in violation of Railway Labor Act).

. Civil Rights Act of 1964, U. S. P. L. 88-352, 78 U. S. Stat. 241 et seq.) N. Y. L. 1964, ch. 948, amd. Executive Law and Labor Law, see infra. U. S. P. L. No. 452 of 88th Cong. [“ anti-poverty law ” — Aug., 1964].

. “ The thrust for implementation of Negroes’ rights to jobs, education and housing remains the most urgent domestic issue of 1964. It was dramatized in the summer of 1963 by the 1 March on Washington ’, and the summer of 1964 promises to produce a variety of civil rights activity, both in the South and in the North.
“The New York State Bar Association considers this a strategic time to express some basic principles for guidance of lawyers and other citizens in meeting the problem. All our human and property rights depend on a system of laws which are to be obeyed. Flaunting any law weakens the grounds of all those rights. New York State has been a pioneer in legal protection of the rights of minorities. There are correlative obligations; on the community, to assure the achievement of racial equality in conformity with law, and on minority groups to conform with law and order in voicing their demands for effective equality.
“ The first basic principle is that the achievement of racial equality requires the urgent efforts of the entire community. One hundred years after the Emancipation Proclamation, and ten years after the school segregation decision, there are still many areas of our life where patterns of segregation remain. Anti-bias housing laws still fall short of permitting the dispersal of minority groups from segregated areas in both urban and suburban communities. Steps to provide true equality of educational opportunity are proceeding slowly, and will require vast sums of money, which may necessitate additional taxes on all our citizens. The opening of new employment opportunities for Negroes has proceeded slowly. There is need for much wider channels of communication, so that the community may be fully aware of minorities’ .problems, and the minorities may be kept informed of the efforts which are being made to implement their rights.
“The second basic principle is that demands for racial equality should be expressed in conformity with law and order. Camping in government or business offices, blocking traffic, or like wilful obstructions, are tactics which we believe both bespeak and beget disrespect for law — a disrespect which is singularly antithetical to the goal of equal rights for all. Such tactics are unnecessary in New York State, where the law imposes virtually no obstacles to peaceful protest against social evils, the courts act impartially, the ballot is open equally to all, and public officials are available to all persons asserting grievances. Moreover, demonstrations which interfere with the civil rights of others are not, we suggest, the best way to achieve equality of treatment. Ideally, the common resolve to promote racial justice should not be prejudiced by any misconduct of civil rights advocates. It is a fact of life that demonstrations which violate the rights of others frequently lose friends and alienate the support of many persons of good will. Frustrations caused by delay in reaching full equality do not justify resort to violence or lawbreaking.
“ The third basic principle is that lawyers should lead in assuring the legal rights of all citizens. They are equipped by training, experience and skill to resolve disputes on a basis of reasonable adjustment, rather than emotion *963 and violence, but they must undertake more active roles both individually and in association than heretofore. We commend the efforts of the Lawyers’ Committee for Civil Rights Under Law, to resolve the nation’s racial problems, and we urge all local bar associations to study what needs to be done in their own areas, and to furnish leadership in accomplishing it. The Lawyers’ Committee urges local bar aid in two particular fields — establishing bi-raeial committees to seek solutions. to civil rights problems, and seeing that all persons in civil rights controversies can obtain competent legal counsel. When a citizen takes the law into his own hands by wilfully violating it, the result is nothing less than anarchy and must never be condoned by an emotional misjudgment that the end justifies the means. Resentment of illegal demonstrations should not be an excuse for relaxing the efforts of the white community to promote racial justice. Local bar associations can help clarify fundamental legal issues as a contribution to public discourse.”
Statement unanimously adopted by the Executive Committee of the New York State Bar Association, June 15, 1964.

. One of the foremost leaders in the Negro movement for equality has stated that the struggle for rights is ultimately the “ struggle for opportunities ” and that the Negro does not want to be told that there is no place where he can be trained to handle a job. Martin Luther King, Jr., “ Why We Can’t Wait ” (Harper & Row, 1963), p. 149.

. In 1959 unemployment averages for whites were at a level of 4.6% while for nonwhites the averages were as high as 11.5%. This disparity in unemployment rates has been attributed to the inadequate participation of Negroes in apprenticeship training. The Economic Situation for Negroes in the United States, 1960 Report by U. S. Dept, of Labor.— 25% of the male Negro teenagers who are in the labor force are unemployed. [Unpublished Gov’t statistics Aug. 22, 1964.]

. a. As early as 1866, at the convention of the- National Labor Congress, it was said that if the union “be misled by prejudice or passion as to refuse to aid the spread of union principles among our fellow toilers, we would be untrue to them * * * to ourselves * * * If these general principles be correct, we must seek cooperation of the African race in America.” A. C. Cameron, “The Address of The National Labor Congress to the Workingmen of the United States.” (Reprinted in Commons, et al., Documentary History of American Society, vol. 9, pp. 141-168.)
b. One year later, Uriah Stephens, of the Knights of Labor, the forerunner of the American Federation of Labor, declared that he could see ahead of him “ an organization * * * that will include men and women of every craft, creed and color.” (Commons, et al., vol. 2, p. 167.)

. United States Cong. House Comm, on Educ. and Labor, Equal Opportunity in Apprenticeship Program Hearing, 87th Cong., 1st Sess. (Aug. 1961), on H. R. 8219.

. The model union pledge, signed in 1962 by 116 national unions and 300 directly chartered labor unions, representing about 11 million workers, declares in unambiguous terms: “We shall seek agreement from management to write into joint apprenticeship training programs in which we participate a non-discrimination clause in regard to admission and conditions of employment of apprentices and shall see that this clause is administered in such a way as to give full and effective application of non-discrimination throughout all such training.”

. Press Release of the Building and Construction Trades Dept., AFIhCIO, June 21, 1963, p. 2.

. a. Woll, “ Labor Looks at Equal Rights in Employment ” 24 Fed. Bar Journal, No. 1, page 93 (Winter 1964).
b. Barkin, The Decline of the Labor Movement, 50-51 (1961).
c. President Meany has noted: “It would be futile to pretend that the 13% million members of the AFL-CIO unions are without exception devoted to the cause of civil rights. They are a cross-section of America, and they reflect the diversity of the nation. But just as truly they reflect the American consensus. That consensus, expressed by AFL-CIO conventions and by conventions of the affiliated national and international unions, is the basis for the AFL-CIO’s determination to abolish all forms of discrimination.” “ Equal Rights for All”, p. 4 (AFL-CIO) Publication No. 133.

. The Industrial Commissioner is granted power to promulgate such rules by section 811 of the Labor Law.

. Amendments to the Executive Law and the Labor Law of New York in relation to equality of opportunity in apprenticeship training will become effective on the 1st of September, 1964. (L. 1964, ch. 948.) Section 296 of the Executive Law is amended by adding an express provision that it shall be an unlawful discriminatory practice for any joint labor management committee controlling apprentice training programs: “ (a) To select persons for an apprentice training program registered with the State of New York on any basis other than their qualifications, as determined by objective criteria which permit review.”
Subdivision 5 of section 815 of the Labor Law has been concurrently amended so as to provide that suggested standards for apprenticeship agreements include: “5. Provision that apprentices shall be selected on the basis of qualifications alone, as determined by objective criteria which permit review and without any direct or indirect limitation, specification or discrimination as to race, creed, color or national origin.”
These two legislative amendments along with the enactment of title 7 (Equal Employment Opportunity) of the Civil Rights Act of 1964 (78 Stat. 241 et seq., Public Law 88-352) which makes it an unlawful employment practice to discriminate on the basis of race in any apprenticeship program, evince the fact that apprentice systems have not heretofore been dedicated to the principle of equality. Both the State and Federal legislation is directed to the same end of abolishing discrimination in the apprentice programs.