532 F.2d 821
 12 Fair Empl.Prac.Cas. 755,
11 Empl. Prac. Dec. P 10,757
EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, and the City of New
York, Plaintiffs-Appellees,
v.
LOCAL 638 . . . LOCAL 28 OF the SHEET METAL WORKERS'
INTERNATIONAL ASSOCIATION and Local 28 Joint
Apprenticeship Committee, Defendants-Appellants,
Sheet Metal and Air-Conditioning Contractors' Association of
New York City, Inc., etc., Defendants.
LOCAL 28, Third-Party Plaintiff,
v.
NEW YORK STATE DIVISION OF HUMAN RIGHTS, Third-Party Defendant.
LOCAL 28 JOINT APPRENTICESHIP COMMITTEE, Fourth-Party Plaintiff,
v.
NEW YORK STATE DIVISION OF HUMAN RIGHTS, Fourth-Party Defendant.
 Nos. 464, 465, Dockets 75-6079, 75-6093.
 United States Court of Appeals,
Second Circuit.
 Argued Dec. 4, 1975.
Decided March 8, 1976.
 
 Sol Bogen, New York City, for Sheet Metal Workers Intern. Ass'n, Local 28 and Union Trustees of Local 28, Joint Apprenticeship Committee.
 Louis G. Corsi, Asst. U. S. Atty., New York City (Thomas J. Cahill, U. S. Atty., for the Southern District of New York, Taggart D. Adams and Steven J. Glassman, Asst. U. S. Attys., New York City, Abner W. Sibal, Gen. Counsel, EEOC, Joseph T. Eddins, Jr., Associate Gen. Counsel, and Beatrice Rosenberg, Atty., EEOC, Washington, D. C., of counsel), for Equal Employment Opportunity Commission.
 Ellen Kramer Sawyer, New York City (W. Bernard Richland, Corp. Counsel of the City of New York, L. Kevin Sheridan, New York City, of counsel), for City of New York.
 Before SMITH and FEINBERG, Circuit Judges, and WARD,* District Judge.
 J. JOSEPH SMITH, Circuit Judge:
 
 
 1
 This appeal requires this court to confront, again, one of the most important and difficult questions currently facing the federal judiciary: the nature and scope of permissible remedies under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.
 
 
 2
 Local 28 of the Sheet Metal Workers' International Association (hereinafter Local 28) is a union, based in New York City, with about 3,500 members. Of this number, approximately three percent are persons of minority descent.[1] The sheet metal workers who belong to Local 28 fabricate and install ducts and other equipment for ventilating, air-conditioning and heating systems. Local 28 maintains jurisdiction over all five of the City's boroughs and exercises complete control over entry into the sheet metal trade in New York City.
 
 
 3
 The Sheet Metal and Air-Conditioning Contractors' Association of New York City, Inc. (hereinafter the Contractors' Association) is a trade organization of builders who do sheet metal construction work. The Contractors' Association has a collective bargaining agreement with Local 28 and the firms which compose the Association normally employ 70-80 percent of the members of Local 28.
 
 
 4
 The Joint Apprenticeship Committee (hereinafter the JAC) is a body of three representatives from Local 28 and the Contractors' Association which oversees a training program for apprentice sheet metal workers. This program involves four years of classroom and on-the-job training at the end of which time the apprentices normally graduate to journeyman status and full membership in Local 28.
 
 
 5
 This appeal has its origins in a broad-reaching action initiated by the Justice Department[2] against several New York City construction unions under Title VII of the 1964 Civil Rights Act. That action charged the defendant unions and their respective apprenticeship programs with instituting and maintaining discriminatory membership policies in violation of federal law. However, the various unions were granted separate trials and, thus, the only defendants-appellants in this appeal are Local 28, the JAC, and the sheet metal Contractors' Association.[3]
 
 
 6
 In the proceeding below in the United States District Court for the Southern District of New York, Local 28 and the JAC were found to have violated Title VII's ban on discriminatory employment and membership practices. The court, Henry F. Werker, Judge, thereupon ordered a variety of remedial actions, including, inter alia, the institution of a court-appointed administrator to oversee Local 28 and the JAC, the payment of back pay to certain victims of past discrimination, the imposition of a remedial racial membership goal upon Local 28 and the replacement of one of the present JAC representatives with a new representative of minority descent.
 
 
 7
 Local 28 and the JAC appeal from Judge Werker's factual findings as to past discriminatory practices. They also contest the nature of the remedy ordered below. The EEOC and the City of New York seek to uphold the factual findings and the remedial order of the district court except that they seek modification of Judge Werker's back-pay order so as to expand the class of persons eligible for a back-pay award.
 
 
 8
 For the reasons outlined below, we modify the district court's order and, as modified, affirm.
 
 I. FACTUAL BACKGROUND
 
 9
 Local 28 and the JAC are no strangers to the courts. In 1964, the New York State Commission for Human Rights, after an administrative hearing, found that Local 28 and the JAC had maintained discriminatory hiring practices in violation of New York law. That finding was specifically affirmed, upon review, by the Supreme Court of New York. State Commission for Human Rights v. Farrell, 43 Misc.2d 958, 252 N.Y.S.2d 649, 652 (Sup.Ct., N.Y. County, 1964). As a result of that judgment, Local 28 and the JAC have been subject to a state judicial decree mandating certain procedures to insure nondiscriminatory recruitment and membership practices.
 
 
 10
 In April and July of 1974, Judge Murray I. Gurfein, sitting in the United States District Court for the Southern District of New York, issued interim orders against Local 28 and the JAC, requiring that certain minority applicants be accepted into the sheet metal apprenticeship program. Finally, Judge Henry F. Werker, after a three-week trial beginning in January of 1975, found that Local 28 and the JAC had violated Title VII. It is the findings and remedies of this last proceeding which are presently on appeal.
 
 
 11
 Local 28 and the JAC argue here that there was insufficient evidence to support Judge Werker's findings. We disagree.
 
 
 12
 The provisions of Title VII relevant here make it unlawful for a labor union, such as Local 28, "to discriminate against, any individual because of his race . . . or national origin," to refuse "applicants for membership . . . because of such individual's race . . . or national origin," and to "cause an employer," such as the members of the Contractors' Association, "to discriminate against an individual" on account of race or national origin. 42 U.S.C. § 2000e-2(c). In addition, Title VII forbids a labor union or apprenticeship committee, such as the JAC, from discriminating "against any individual because of his race . . . or national origin." 42 U.S.C. § 2000e-2(d).
 
 
 13
 In the record before Judge Werker, there was ample evidence to find that Local 28 and the JAC had violated these statutory provisions.
 
 
 14
 There are four means by which an individual can be admitted to membership in Local 28. The majority of Local 28 members are admitted upon graduation from the apprenticeship program administered by the JAC. In addition, persons in allied, "sister" unions in the construction industry may be allowed to transfer directly into Local 28, without prior training in the apprenticeship program. There is a third route onto the Local 28 membership rolls by which an individual may take a battery of journeyman-level tests, without formal apprentice training or membership in an allied union, and upon passage of these examinations, the individual is certified as a journeyman and admitted to Local 28. Finally, sheet metal workers in nonunion shops become members of Local 28 if Local 28 subsequently organizes their shop, and if their employer certifies that his workers perform at journeyman standards. Local 28 also issues temporary work permits to individuals who are not permanent members of the union of sheet metal workers.
 
 
 15
 There is ample evidence that all the routes into Local 28 have been blocked to minority group members as a result of discriminatory practices by Local 28 and the JAC. The trial record in this case is voluminous and the facts before the district court were more than adequate to sustain its findings. We describe some of these facts briefly to indicate the consideration behind our decision that, as Judge Werker found, Local 28 and the JAC have consistently and egregiously violated Title VII.
 
 
 16
 Entrance into the apprenticeship program is gained by passing certain written and manual tests and by possession of a high school diploma. The evidence is clear that these requirements disqualify blacks and Spanish-speaking applicants to a far greater extent than they disqualify non-minority applicants to the apprenticeship program.
 
 
 17
 Under Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), job requirements which disqualify minority group members to a significantly greater extent than they disqualify whites violate Title VII unless it can be demonstrated that the requirements are "job-related."[4] See also Albemarle Paper Co. v. Moody, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280; McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668, 677 (1973); Vulcan Society of the New York City Fire Department, Inc. v. Civil Service Commission, 490 F.2d 387 (2d Cir. 1973). This burden of proof Local 28 and the JAC have failed to meet.
 
 
 18
 To sustain their burden of proving job-relatedness, Local 28 and the JAC relied upon the expert testimony of an industrial psychologist, Dr. Judah Gottesman of the Stevens Institute of Technology. However, Dr. Gottesman's testimony was, at best, equivocal in its implications and was clearly insufficient to sustain the union's claim of job-relatedness.
 
 
 19
 Dr. Gottesman indicated that, for technical reasons primarily related to sample size, it was impossible to determine whether or not the entrance exams used for admission to the apprenticeship program bear any relation to on-the-job abilities at the end of the training program. Indeed, Dr. Gottesman, responding to the dearth of evidence as to the job-relatedness of these entrance examinations, had suggested that most of the tests in use be abandoned and others added in their place. This the JAC and Local 28 have declined to do.
 
 
 20
 Moreover, even if the tests used for entrance into the apprenticeship program were found to be job-related, other aspects of Local 28's behavior would sustain a finding of discrimination in the operation of the apprenticeship program. The 1964 New York state court decision, State Commission for Human Rights v. Farrell, supra, dwelt heavily upon admissions into the apprenticeship program and required the use of objective admissions tests rather than the nepotistic criteria for admissions to apprenticeship in use until then. Local 28 responded to this order by establishing, with union funds, "cram courses" for the sons and nephews of present union members in order to prepare them for the entrance tests. This was contrary to the spirit and letter of the New York court's order.
 
 
 21
 Of course, a cram course available to all applicants would be a different matter. But the decision to use union funds to help sons and nephews circumvent the objective tests required by the court evinces bad faith on the part of Local 28.
 
 
 22
 The evidence with respect to the other means of union admission reveals a pattern of more blatant discrimination.
 
 
 23
 Despite intense pressure from its International Association, Local 28 has historically refused to organize the blowpipe industry in the New York area. The blowpipe work force which Local 28 has refused to organize is predominantly of minority descent and, according to the testimony of one contractor, it is "common knowledge" in the industry that Local 28's attitude towards the blowpipe workers is a result of their racial make-up. Eventually, the International Association had to organize these workers separately since Local 28 refused to do so.
 
 
 24
 There is thus a separate union in New York City predominantly composed of minority group blowpipe workers. This group has been kept at arm's length by Local 28 notwithstanding their membership in the same International.
 
 
 25
 Local 28 has consistently accepted white transferees from allied construction unions while denying transfer to blacks with equivalent qualifications. In particular, black blowpipe workers have been denied transfer into Local 28 while white workers from the same union have been allowed in. This constitutes a particularly blatant form of discrimination since many of these minority blowpipe workers are entitled to transfer into Local 28 as a matter of right under the constitution of the International Association to which Local 28 belongs.
 
 
 26
 Local 28 has also issued temporary work permits to white members of allied construction unions, some from areas far removed from New York City, while denying such work permits to minority group sheet metal workers who already reside in the New York City area.
 
 
 27
 Local 28's performance record to date would be even worse had it not been for the rather minor concessions it has grudgingly made under court order. Indeed, compliance with Judge Gurfein's interim order was delayed for a considerable period and eventual compliance occurred only under heavy pressure.
 
 
 28
 This brief sample of the evidence against Local 28 and the JAC is sufficient to indicate that Judge Werker's findings of Title VII violations were not "clearly erroneous." Rule 52(a), Fed.R.Civ.P. Indeed, the brief submitted to this court by Local 28 and the JAC does not even make a serious effort to contest the finding of Title VII violations. The real issue before this court is the nature of the remedies in a case such as this. It is to the legal background of this issue that we now turn.
 
 II. LEGAL BACKGROUND
 
 29
 A. Reverse Discrimination and Effective Enforcement of Title VII
 
 
 30
 The underlying considerations behind an order such as that on appeal are easy to state, if difficult to reconcile. When dealing with recalcitrant unions which have defied gentler means of enforcement, a mathematical membership goal may be viewed as the only effective means to eradicate discriminatory practices and to remedy the effects of past discrimination. On the other hand, the use of such membership goals means, in practice, that certain nonminority persons will be kept out of the defendant union solely on account of their race or ethnic background. Such "reverse discrimination" contradicts our basic assumption that individuals are to be judged as individuals, not as members of particular racial groups.
 
 
 31
 The tension between these two policy considerations is demonstrated by certain facially-contradictory provisions of the Civil Rights Act of 1964. 42 U.S.C. § 2000e-2(j) specifically prohibits "preferential treatment" in hiring practices to correct racial "imbalance." As Judge Hays demonstrated in his dissent in Rios v. Enterprise Association Steam Fitters Local 638 of U. A., 501 F.2d 622 (2d Cir. 1974), (a dissent Judge Feinberg later characterized as "powerful," Patterson v. Newspaper & Mail Deliverers' Union of New York and Vicinity, 514 F.2d 767, 776 (2d Cir. 1975)), there are strong indications that many of the congressmen who supported § 2000e-2(j) thought they were prohibiting the use of numerical goals such as that ordered by Judge Werker in the proceeding below.
 
 
 32
 On the other hand, 42 U.S.C. § 2000e-5(g) specifically gives authority to the district courts to order any "affirmative action" which "may be appropriate" to remedy past discrimination. Section 2000e-5(g) expressly states that the scope of the district courts' remedies for employment violations is to be "equitable," which is to say, broadly discretionary.
 
 
 33
 The tension between the needs of effective enforcement and the avoidance of reverse discrimination is further manifested in the opinions of this court. The Rios decision, supra, affirming union membership goals for minority workers, was made by a sharply divided panel. Those panels which have imposed membership goals have done so with great reluctance, stressing the temporary nature of the goals and the egregiousness of the behavior being corrected. See, e. g., Bridgeport Guardians, infra at 1340.
 
 
 34
 Notwithstanding such reservations, minority membership goals have been condoned on specific occasions as "appropriate" exercises of equitable powers.
 
 
 35
 One of the most recent Second Circuit panels to confront the problem of Title VII remedies involved the case of Kirkland v. New York State Department of Correctional Services, 520 F.2d 420, 427 (2d Cir.), rehearing en banc denied, 531 F.2d 5 (2d Cir. 1975). The Kirkland court promulgated a two-fold test for the imposition of temporary quotas. There must first be a "clear-cut pattern of long-continued and egregious racial discrimination." Second, the effect of reverse discrimination must not be "identifiable," that is to say, concentrated upon a relatively small, ascertainable group of non-minority persons.
 
 
 36
 Thus, in Bridgeport Guardians, Inc. v. Members of the Bridgeport Civil Service Commission, 482 F.2d 1333 (2d Cir. 1973), this court upheld temporary employment goals for use in the selection of new patrolmen for the Bridgeport, Connecticut police force. However, the use of racial goals for promotions above the rank of patrolman was rejected. The court's decision in this instance presaged the logic of the Kirkland panel. Minority goals were not appropriate for promotion in the ranks above patrolman (1) because there was inadequate evidence of discrimination in the upper ranks and (2) because
 
 
 37
 the imposition of quotas will obviously discriminate against those Whites who have embarked upon a police career with the expectation of advancement only to be now thwarted because of their color alone. The impact of the quota upon these men would be harsh and can only exacerbate rather than diminish racial attitudes.
 
 
 38
 Bridgeport Guardians, supra at 1341.
 
 
 39
 While some whites were to be kept off the Bridgeport police force as a result of the entry level quota for patrolmen, that group of individuals could not be identified with certainty and hence there were no ascertainable victims of reverse discrimination. However, the white officers who were already on the force were a different matter: they were an easily identifiable group for whom the hardship of reverse discrimination was direct, obvious and personal.
 
 
 40
 Similarly, the Rios panel, which, by a divided vote sanctioned temporary employment goals, analyzed the situation before it in terms essentially the same as those used in Kirkland. In particular, the Rios situation was distinguished from the facts of DeFunis v. Odegaard, 416 U.S. 312, 94 S.Ct. 1704, 40 L.Ed.2d 164 (1974), on two grounds. First, in Rios there was substantial evidence of purposive "past discrimination" (as opposed to a mere racial "imbalance" of nondiscriminatory origins). Second, the defendant union in Rios was capable of expanding its total membership so as to dilute the impact of the remedy upon non-minority persons. In DeFunis, in contrast, the fixed number of law school spaces concentrated the impact of reverse discrimination upon a small and narrow group of persons, i. e., the applicants next in line on the University of Washington's "waiting list" for law school admissions. Rios, supra at 630, n. 6.
 
 
 41
 Finally, in Kirkland, the court explicitly adopted a formula which my brothers find controlling in the instant case: the imposition of racial goals is to be tolerated only when past discrimination has been clear-cut and the effects of "reverse discrimination" will be diffused among an unidentifiable group of unknown, potential applicants rather than upon an ascertainable group of easily identifiable persons. In the court's words:
 
 
 42
 The smaller group participating in a civil service examination, the more pointed the problem (of reverse discrimination) becomes. We can no longer speak in general terms of statistics and class groupings. We must address ourselves to individual rights.
 
 
 43
 A hiring quota deals with the public at large, none of whose members can be identified individually in advance. A quota placed upon a small number of readily identifiable candidates for promotion is an entirely different matter. Both these men and the court know in advance that regardless of their qualifications and standing in a competitive examination, some of them may be bypassed for advancement solely because they are white.
 
 
 44
 Kirkland, supra at 429.
 
 B. Merit System and Job-Relatedness
 
 45
 Just as Title VII evinces a desire to avoid the identifiable forms of reverse discrimination, it also indicates a congressional intent to protect bona fide, nondiscriminatory "professionally developed ability test(s)." 42 U.S.C. § 2000e-2(h). The authoritative construction of this provision in earlier cases makes a more extended discussion unnecessary at this date. Griggs, supra; Bridgeport Guardians, supra; Chance v. Board of Examiners, 458 F.2d 1167 (2d Cir. 1972). Suffice it to say that a job requirement which falls with disproportionate effect upon minority-group applicants must be justified by proof of "job-relatedness." While it is not always clear what quantum of evidence is required to establish job-relatedness, see Albermarle, supra, 422 U.S. at 423, 449, 95 S.Ct. at 2374, 2387, 45 L.Ed.2d at 299, 316, (separate opinion of Chief Justice Burger) (separate opinion of Justice Blackmun), it is clear that, once such job-relatedness is proven, a test or job requirement is immunized from attack under Title VII.
 
 
 46
 With these legal standards identified, we turn to the task of applying them to the order of the district court.
 
 III. THE DISTRICT COURT'S ORDER
 
 47
 Judge Werker's order may be reviewed as consisting of six major provisions. First, a court-appointed administrator is granted extensive supervisory power over Local 28 and the JAC. The administrator is to develop and enforce more detailed plans for achieving the goals outlined in broad terms by Judge Werker's decree.
 
 
 48
 Second, Local 28 and the JAC are enjoined from all future violations of Title VII.
 
 
 49
 Third, one of the present union representatives to the JAC is to be replaced by a representative of minority descent. This is done, apparently, to ensure an internal means of enforcing compliance with Title VII.
 
 
 50
 Fourth, Local 28 and the JAC are required to attain, by 1981, a combined membership in the union and apprenticeship program which is composed of 29 percent of persons of minority descent. Interim membership goals are to be agreed upon by the parties and enforced by the court-appointed administrator.
 
 
 51
 Fifth, Local 28 is to offer at least once a year a nondiscriminatory test for journeymen and for entrance into the apprenticeship program and is to allow transfers and issue temporary work permits on a nondiscriminatory basis. Local 28 and the JAC are to engage in extensive recruitment and publicity campaigns in minority neighborhoods in order to ensure a broad applicant pool for these tests and transfers.
 
 
 52
 Sixth, back pay is to be awarded to persons who applied to and were rejected by Local 28 on account of race or national origin and who can offer documentary evidence of such discriminatory rejection.
 
 
 53
 The appointment of an administrator with broad powers over Local 28 and the JAC is clearly appropriate under the circumstances here. While union self-government is desirable and is, indeed, an ideal to which the law aspires, 29 U.S.C. § 401, our interest in union self-government cannot immunize Local 28 from the consequences of its actions. The apparent failure of the New York court order to change Local 28's membership practices to an appreciable extent and the rather reluctant response made by Local 28 to Judge Gurfein's orders convince us that it is necessary for a court-appointed administrator to exercise day-to-day oversight of the union's affairs.
 
 
 54
 The abridgement of self-government implied by this action will, hopefully, prove to be temporary. Moreover, the need for such strict enforcement seems thoroughly justified by the union's past recalcitrance and by the requirements of Title VII.
 
 
 55
 We similarly believe that it is appropriate to enjoin the defendants in this litigation from repeating their past discriminatory practices. Certainly, the record of Local 28 and the JAC provides a reasonable basis for inferring that future violations of Title VII might occur in the absence of such an injunction.
 
 
 56
 While we agree that the record here amply demonstrates the need for a court-appointed administrator and for an injunction against the defendants, we do not approve of the district court's decision to require replacement of one of the JAC representatives. Such an action seems superfluous in light of the broad supervisory powers granted to the administrator who, for purposes of compliance with Title VII, will serve as the superior of the JAC representatives. Any recalcitrance on the part of the JAC representatives may be overcome by the exercise of the administrator's authority.
 
 
 57
 Moreover, this part of the district court's order cannot be justified under the "non-identifiability" test adopted by this court in Kirkland. The district court's order with respect to the appointment of a minority-group JAC representative is, in effect, a quota mandating that one-third of the JAC's membership be of minority descent. This is, moreover, a quota which must be met by replacing (or, in the parlance of the trade, by "bumping") a white incumbent from the JAC. This is forbidden by Title VII and the law of this circuit.
 
 
 58
 The Kirkland court held that the imposition of a racial goal can be justified only when two conditions are met: there must be a long and egregious pattern of past discrimination and the effects of the goal cannot fall upon a relatively small, identifiable group of reverse discriminatees. While the requirements with respect to past practices are amply met in this situation, the order requiring the replacement of a white JAC representative fails under the second standard of "non-identifiability."
 
 
 59
 In this instance, the impact of the racial goal would be direct, immediate and obvious: one of the two JAC representatives of the Union must be "bumped." This is the type of narrowly-focused, ascertainable reverse discrimination which Kirkland and its predecessors forbid and, accordingly, we reverse that part of the district court's order requiring replacement of an incumbent JAC representative.
 
 
 60
 While we disapprove of a membership goal for the JAC, we affirm the use of such a goal with respect to overall membership in Local 28 and the apprenticeship program. As this court noted in Kirkland and Bridgeport Guardians, Inc., supra, an entry-level quota has a more diffuse and amorphous effect upon reverse discriminatees than a quota used to bump incumbents or hinder promotion of present members of the work force. An entry-level goal has less ascertainable effect since we cannot readily determine who it is that is being kept out. Accordingly, entry-level goals have less identifiable impact upon reverse discriminatees and are therefore less objectionable as temporary remedies.
 
 
 61
 Since the first part of the Kirkland test, a long and persistent pattern of discrimination, is amply supported by the record, we approve the 29 percent overall membership goal established by Judge Werker.
 
 
 62
 The district court's order also requires that a non-discriminatory examination, validated under EEOC guidelines, be given at least annually for entrance into the apprenticeship program and for direct admission at the journeyman level. It is the very specific teaching of Griggs and Albemarle that examinations, when used by employers and unions, must be job-related. Thus, to the extent that the order requires future tests administered by Local 28 and the JAC to be validly job-related, the order is clearly mandated by the decisions of the Supreme Court.
 
 
 63
 However, Judge Werker's order goes beyond the mere requirement that tests, when given, be job-related. The order on appeal also mandates that apprenticeship and journeyman tests must be administered at least once a year and that extensive recruitment of minority candidates must precede these tests.
 
 
 64
 We approve this part of the order as an appropriate exercise of the district court's equitable discretion. It would obviously be possible to circumvent the requirement of job-related tests by administering no tests at all. Moreover, a decision to refrain from giving journeyman and apprenticeship tests or to restrict candidate recruitment could effectively freeze the union's membership in its present racial composition. This is the difficulty which Judge Werker has sought to avoid by requiring annual testing and publicity, and we affirm for the reasons which gave rise to his order in the first instance.
 
 
 65
 However, we modify the district court's order in one respect. At oral argument, it was established that, pursuant to the order now on appeal, the parties to this litigation and the court-appointed administrator have chosen to implement the decision of the district court by establishing a ratio of white to minority acceptances into the apprenticeship program. This ratio is to be maintained even if it requires accepting a minority applicant with a lower score than a white applicant.[5]
 
 
 66
 My colleagues feel that this is unacceptable under Griggs, Kirkland and Title VII as we interpret them above. They consider that the import of those authorities is that the results of job-related tests are to be honored since they are genuinely neutral in intent and effect, i. e., they make ability to perform the sole criterion for selection. They hold that it is inconsistent with this policy to administer admittedly neutral, non-discriminatory tests (approved by the EEOC) and then set those results aside because of the racial make-up of the applicants who pass.
 
 
 67
 They hold that Griggs and 42 U.S.C. § 2000e-2(h) require that test results be respected whenever those tests are validly job-related.
 
 
 68
 The writer disagrees with the majority of the panel on this point, essentially for the reasons set forth by Judge Mansfield dissenting from the denial of en banc in Kirkland v. New York State Department of Correctional Services, 531 F.2d 5 (2d Cir. 1975), and would approve the application of the temporary quota to the entrants to the apprenticeship program, presently set at 3 to 2, minority to majority applicants, as affirmative action under 42 U.S.C. § 2000e-5(g) appropriate to remedy past discrimination.
 
 
 69
 This apprenticeship program presents an entry-level situation parallel to that of Bridgeport Guardians. It is true that the relatively small number of openings makes those subject to reverse discrimination fairly easily identifiable. This was, however, true in Bridgeport Guardians and is necessary to correct the illegally established racial makeup of the present membership. United States v. Wood, Wire & Metal Lathers, 471 F.2d 408, 413 (2d Cir. 1973); Rios v. Enterprise Association Steamfitters Local 638 of U.A., 501 F.2d 622, 629 (2d Cir. 1974). Cf. Kirkland v. New York State Department of Correctional Services, 520 F.2d 420 (2d Cir. 1975). The plan adopted here does not entail the discharge or demotion of majority members already in place, as did the plan disapproved in Chance v. Board of Education, --- F.2d ---- (2d Cir. 1976). It does reduce the appointment opportunities of new majority applicants temporarily until the past illegal discrimination has been remedied.
 
 
 70
 The membership of the local constitutes the pool of qualified persons who are able to compete for available jobs in the Metropolitan area. Minorities have effectively and illegally been excluded from that pool. The apprenticeship program is one of the best available means of correcting within a reasonable time the situation in the industry by erasing the effects of the illegal practices. It involves in a sense reverse discrimination. However, it is positive remedial action not solely to achieve racial balance, but to remove the illegally created imbalance in the industry labor pool. I would approve the court's determination on the apprenticeship program, including the present temporary 3 to 2 ratio. My colleagues, however, consider that the court has exercised its full remedial authority in a case such as this when an acceptable examination is used, even at an entry level and that the application of racial quotas to the lists of those successful in such an exam is forbidden reverse discrimination.
 
 
 71
 We accordingly modify the order insofar as it might be interpreted to permit white-minority ratios for the apprenticeship program after the adoption of valid, job-related entrance tests. Acceptance into the training program must be based on tests results alone.
 
 
 72
 Our decision, of course, makes it particularly important that the recruitment of qualified minority test candidates be thorough and vigorous. We believe that the court-appointed administrator has ample authority to assure that result.
 
 
 73
 We also recognize that, as a result of this decision, a heavy burden may be placed upon direct qualification and admission and transfer from allied unions as the means of reaching the 29 percent membership goal. This, however, seems most appropriate under the circumstances. The persons who are presently eligible for transfer into Local 28 are the persons who have felt the brunt of the union's past discriminatory practices. They are largely older individuals who have been denied entry into Local 28 in the past or who have been forced into essentially segregated unions as a result of Local 28's practices.
 
 
 74
 Finally, we modify Judge Werker's back-pay order so as to allow individuals to prove by means of testimonial evidence that they were unlawfully excluded from Local 28 and the apprenticeship program. Judge Werker has limited back-pay awards to those who could provide documentary proof of application and rejection. He justified this limitation on the ground that applicants with only testimonial evidence had too "speculative" a claim for the court to entertain.
 
 
 75
 We think that Albemarle, supra, compels a different result. The Supreme Court has made clear that back pay is to be the rule rather than exception under Title VII and that back pay is to be awarded whenever possible so as to deter Title VII violations and so as to "make whole" the victims of past discrimination. In the Court's words:
 
 
 76
 (G)iven a finding of unlawful discrimination, back pay should be denied only for reasons which, if applied generally, would not frustrate the central statutory purposes of eradicating discrimination throughout the economy and making persons whole for injuries suffered through past discrimination.
 
 
 77
 Albemarle, supra 422 U.S. at 421, 95 S.Ct. at 2373, 45 L.Ed.2d at 298.
 
 
 78
 In the instant setting, a denial of back pay to those persons who possess only testimonial evidence of their application and rejection would serve to "frustrate the central statutory purposes" of Title VII. One of the reasons that applicants may have no documentary proof of discrimination against them is that Local 28 and the JAC have kept incomplete records of their admission practices. To deny back pay to persons who, as a result of the union's actions, have no written proof is to reward the union and the JAC for their record-keeping failures.
 
 
 79
 Beyond that consideration, back pay should be given as broadly as possible in order to effectuate the dual policies of remediation and deterrence. There is a class of individuals whose claims are too speculative for adjudication: those with neither written nor testimonial evidence of application and rejection. Thus, those who never applied to Local 28 or the JAC because of their well-deserved reputation for discrimination are, regrettably, ineligible for back pay. But those who did apply and who can prove discrimination by written or testimonial evidence are entitled to back pay.[6]
 
 
 80
 In summary, we modify the district court's order to eliminate the requirement that a white JAC representative be replaced by a representative of minority descent, to forbid minority-white admission ratios to the apprenticeship program once valid job-related tests have been adopted, and to extend back pay to persons who can prove by testimonial evidence that they applied to and were rejected by Local 28 and the JAC for unlawful reasons.
 
 
 81
 So modified, the order is affirmed.
 
 FEINBERG, Circuit Judge (concurring):
 
 82
 Because Judge Smith's opinion accurately tracks the law of this circuit as it now stands, I concur in the result we are required to reach. However, I believe it appropriate to set forth the following views.
 
 
 83
 Judge Smith correctly describes the holding of Kirkland v. New York State Dep't of Correction Servs., 520 F.2d 420 (2d Cir. 1975), as allowing temporary quotas as a remedial measure only when there has been a "clear-cut pattern of long-continued and egregious racial discrimination," 520 F.2d at 427, and the reverse discrimination is not concentrated on a relatively small, identifiable group. Appellees in Kirkland sought rehearing en banc, which was denied with three active judges dissenting and expressing the view that Kirkland conflicted with prior decisions of this court. At 5, 10 (2d Cir. 1975). Nevertheless, in Chance v. Board of Examiners, --- F.2d ----, ---- (2d Cir. 1976), the majority, Judge Oakes dissenting, relied upon Kirkland in setting aside a quota.
 
 
 84
 Since the issue of the legality of quotas is bound to recur and the court seems badly divided, and since Judge Smith has set forth his views on that issue, it may be useful for me to discuss it briefly. In Patterson v. Newspaper & Mail Deliverers Union of N.Y. & Vicinity, 514 F.2d 767, 775 (2d Cir. 1975) (concurring opinion), I expressed doubts regarding the legality of racial quotas. Although the opinion in Kirkland cites that concurrence with approval, 520 F.2d at 427, n. 22, it nevertheless seems to me even at the risk of appearing ungracious that the test laid down in Kirkland is itself open to question. The dissenting opinion of Judge Hays in Rios v. Steamfitters Local 638, 501 F.2d 622, 634 (2d Cir. 1974), strongly disapproved of racial quotas, relying on the legislative intention expressed in section 703(j) of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(j). The opinion in Kirkland also cites Judge Hays's dissent with approval, 520 F.2d at 427, n. 22, but allows the continued use of racial quotas, albeit under sharply limited circumstances; the opinion does not discuss the effect of section 703(j), probably because the parties ignored it. I respectfully suggest that the effect of that section, which is reproduced in the margin, cannot be ignored.[1]
 
 
 85
 Since we disapprove the racial quota here, it is not now necessary for me to explore the issue at greater length. I emphasize, however, that the disapproval of racial quotas expressed in section 703(j) does not prevent the granting of broad relief to effectuate Title VII's purpose of correcting racial injustice. Focusing on individuals rather than on groups in granting relief, as by providing an immediate remedy to identifiable plaintiffs who were themselves discriminatorily denied jobs, can accomplish much without resort to quotas. Cf. Acha v. Beame, 531 F.2d 648 (2d Cir. 1976). The remedy would go to all who fell into this category and would be based, not upon a percentage or quota perhaps forbidden by section 703(j), but upon proof of individual discrimination. Indeed, Judge Smith's opinion in this case utilizes this concept in approving a back-pay award to those who had applied to Local 28 and JAC and had been rejected for racial reasons. See also Acha v. Beame, supra. However, since Kirkland presently controls and since I agree with the result reached here, further discussion of the problem is not now necessary.
 
 
 
 *
 Robert J. Ward, United States District Judge for the Southern District of New York, sitting by designation
 
 
 [1]
 For the purpose of this opinion, the term "minority" refers primarily to persons who are black or of Spanish-speaking lineage
 
 
 [2]
 While the Justice Department initiated this action, the Equal Employment Opportunity Commission (EEOC) has been substituted as the named plaintiff agency for the federal government. The City of New York has been granted status as a plaintiff-intervenor
 
 
 [3]
 There is no claim here that the Contractors' Association has engaged in discriminatory employment policies. The Association is a party only for the purposes of relief and because, under the standards of Rule 19(a), Fed.R.Civ.P., the Contractors' Association is an indispensable party. Fed.R.Civ.P. 19(a)
 
 
 [4]
 There is language in Griggs which might be interpreted to indicate that job-relatedness is not required of employment and entrance criteria if there is no intent to discriminate and if there is no history of past discrimination. However, we need not address that issue here since the decision of the New York Supreme Court in State Commission for Human Rights v. Farrell, supra, found that Local 28 and the JAC had maintained discriminatory employment and membership practices. Since the issue of past discrimination may be res judicata and is certainly established to our satisfaction, we need not decide if Griggs would require job-relatedness in the absence of such prior discrimination
 
 
 [5]
 Subsequent to the oral argument in this appeal, EEOC and the City of New York advised this court that the apprenticeship ratios under discussion are embodied in an agreement negotiated by the parties which the district court approved on November 13, 1975. Appeal is now pending from an order setting a temporary 3 minority: 2 white apprentice admission rate. Meanwhile, the parties have agreed to the admission to the class entering in February, 1976, of 66 individuals, 33 minority and 33 white, each of whom would have been admitted whether the ratio was applied or not. (Additional minority members would have been admitted if the ratio were applied.) Nevertheless, we find it incumbent to address this issue now since the ratios in question are adopted pursuant to the order now under appeal, and we feel it is appropriate and indeed necessary for us to clarify what this order does (and does not) permit
 
 
 [6]
 We are aware that in our recent decision in Acha v. Beame, 531 F.2d 648 (2d Cir. 1976), we indicated that retroactive or constructive seniority could be granted to female police officers who could prove that they had been deterred from applying for jobs in the police department because of its discriminatory practices, relief arguably broader than that granted here. However, the remedy in Acha was retroactive seniority, far less drastic for a defendant to be required to bear than back pay. Moreover, the retroactive seniority in Acha was, by the nature of plaintiffs' class, limited to those who were subsequently hired after the defendants had ceased discriminating. The relief of back pay granted here is not so limited so that the number of potential claimants, and the potential burden on defendants, is much greater. The fact that the Acha plaintiffs all eventually did seek employment as police officers when that job was finally opened to women also makes it more likely that they may indeed have been deterred from applying only by the defendants' discrimination. Finally, the discrimination in Acha was an official limitation of certain job categories to males, while in this case the discriminatory practices complained of were covert. Limitation of relief in Acha to those who actually did apply in those circumstances would have been far harsher than such a limitation here, where the alleged deterrence stemmed not from an officially announced discriminatory policy but from rumors of unfairness
 
 
 [1]
 Section 703(j) provides:
 Nothing contained in this subchapter shall be interpreted to require any employer, employment agency, labor organization, or joint labor-management committee subject to this subchapter to grant preferential treatment to any individual or to any group because of the race, color, religion, sex, or national origin of such individual or group on account of an imbalance which may exist with respect to the total number or percentage of persons of any race, color, religion, sex, or national origin employed by any employer, referred or classified for employment by any employment agency or labor organization, admitted to membership or classified by any labor organization, or admitted to, or employed in, any apprenticeship or other training program, in comparison with the total number or percentage of persons of such race, color, religion, sex, or national origin in any community, State, section, or other area, or in the available work force in any community, State, section, or other area.