**LOCAL UNION NO. 35 OF the INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS**

v.

**CITY OF HARTFORD et al.**

Civ. No. H-77-167.

United States District Court, D. Connecticut.

Dec. 11, 1978.

William S. Zeman, West Hartford, Conn., Joel M. Ellis, Hartford, Conn., for plaintiff.

Mary R. Hennessey, Corp. Counsel, Barry S. Zitser:, Richard M. Cosgrove, Asst. Corp. Counsels, Hartford, Conn., Richard F. Bellman, Eisner, Levy, Steel & Bellman, New York City, for defendant.

## RULING ON PENDING MOTIONS

BLUMENFELD, District Judge.

This action represents a challenge to the implementation of the defendant City of Hartford's Affirmative Action Plan, which seeks to achieve 15 percent minority group employment on construction projects awarded by the City. Plaintiff Local Union No. 35, International Brotherhood of Electrical Workers (hereinafter the Union or Local 35) seeks declaratory and injunctive relief invalidating the Affirmative Action Plan (hereinafter the Plan) to the extent that it requires the Union to give preference to minority workers when referring workers for employment. The Union contends that the Plan mandates discriminatory treatment of nonminority employees on the basis of race, in violation of state and federal statutory and constitutional standards.

The plaintiff Local 35 represents all electrical workers who work for an employer with whom Local 35 has a contractual relationship in various counties, including Hartford County, in Connecticut. The defendants are the City of Hartford (hereinafter the City) and several City agencies and officials having responsibility for enforcement of Hartford's Affirmative Action Plan. This case is now before the court on cross-motions for summary judgment.

## I. Background

### A. The Affirmative Action Plan

On February 9, 1975, the Court of Common Council, the City of Hartford's chief legislative body, adopted the Hartford Affirmative Action Plan Ordinance (hereinafter Ordinance), Revised Code of Hartford §§ 2–321 to 2–333. The stated purpose of the Ordinance is to insure:

> "equal employment opportunity for minority group persons and women in all phases of construction work, including the bidding process, performed pursuant to major contracts offered and awarded by the city under the provisions of the Charter and this Code."

Ordinance § 2–321. The Court of Common Council declared in the Ordinance that legislative action was required due to a pattern of past and continuing discrimination among contractors and labor unions in the construction industry in the Hartford area. The Court of Common Council declared and found, inter alia, that:

"(a) Many contractors, labor unions, hiring halls, crafts and trades in the construction industry in the Greater Hartford Area have discriminated, and continue to discriminate, against minority group persons and women.

"(b) It is the intention of the city not to aid or abet such discrimination by awarding contracts to contractors who practice or have practiced discrimination against minority group persons and women, or who have subcontracted to, or engaged the services of, individuals and organizations that deny or have denied equal employment opportunity to minority group persons and women.

"(c) The continuing effects of past and present discrimination against minority group persons and women by the construction industry may be prevented, mitigated and/or eliminated by an affirmative action plan."

Ordinance § 2–322.

The Affirmative Action Plan, adopted in accordance with section 2–325 of the Ordinance, is included as a contractual provision in all major City construction contracts. Since the City of Hartford enters into contracts for public works and improvements with contractors and not labor organizations or vendors, the Affirmative Action Plan is designed to encourage minority hiring on City contracts by placing primary responsibility on the contractors. All City contractors submitting bids on City contracts are required to provide an affidavit executed "by all subcontractors and officials of all organizations with which they have referral arrangements or agreements covering workers to be employed on the project involved, which affidavits shall incorporate such subcontractors and organizations into the affirmative action plan." Ordinance § 2–327.

The Plan requires signatory contractors to make a "good faith effort" to achieve a level of minority group employment on City jobs of at least 15 percent on a trade-by-trade basis.[1] Plan § 5(A). The Plan also calls upon the craft unions to make good faith efforts to increase minority membership in the unions to 15 percent and to assist in achieving the 15 percent minority employment goal. Plan § 5(A), (D). "Good faith effort" is defined in the Ordinance (§ 2–323) as "every reasonable attempt to comply with the provisions of this article and the Hartford Affirmative Action Plan and every possible measure to achieve the level and participation of minority group and female workers and trainees established by the plan . . .." The Plan establishes a five-year time limit within which to achieve these percentage goals. Plan § 5(A).

B. *Local 35's Noncompliance with the Hartford Affirmative Action Plan*

On October 31, 1975, plaintiff Local 35 was certified under the City's affirmative action program to participate on City construction contracts.[2] The Union submitted to the City an affidavit dated October 8, 1975, stating that it would not discriminate in regard to minority group workers and

---

1. In terms of implementation and enforcement, should the City Manager or his designee determine that a contractor is failing to meet the affirmative action goals, the City Manager is permitted to cancel the contract in question or withhold payment under the contract. The contractor may then appeal from the City Manager's actions to the City's Contract Enforcement Committee where an opportunity for a hearing is provided. Ordinance § 2–330.

2. There are two methods by which a labor organization can become eligible to participate on City construction projects. The labor organization may either sign the Hartford Affirmative Action Plan, Ordinance § 2–327, or be certified in accordance with section 2–328 of said Ordinance. The plaintiff Union has been certified in accordance with the latter procedure. (The certification provisions of section 2–328 are only available to organizations which perform "substantial construction work beyond the Greater Hartford Area . . ..") The certification provisions of section 2–328 require the submission of certain data and pledges sufficient to enable the City Manager, or his designee, to make a determination as to whether the labor organization is an equal opportunity organization.

that it would make a good faith effort to comply with all provisions of the Hartford Affirmative Action Plan. Pursuant to its certification, Local 35 referred workers to City-contracted construction jobs.

Under a collective bargaining agreement between Local 35 and the Central Connecticut Chapter, Hartford Division, National Electrical Contractors Association, Inc., Local 35 is the sole and exclusive source of referral of electrical workers for employment with firms which have assented to be bound by the collective bargaining agreement. The Union's referral procedure is open to both members and nonmembers of the Union. The referral procedure functions in the following manner: the Union maintains an "Out of Work List," which lists out-of-work applicants in the chronological order of the dates they register their availability for employment. (Said list is also known as the "rotation list.") The Union refers applicants for employment in the order in which the applicants appear on the Out of Work List.

The events directly leading up to this lawsuit began in January 1977, when the City of Hartford received correspondence from two different electrical contracting companies stating that the companies were unable to meet the 15 percent affirmative action hiring goal for electrical workers of minority descent. An investigation conducted by a representative of the City's Commission on Human Rights determined that the problem arose because Local 35 was referring electricians strictly on the basis of its rotation list. It was found at the time of the Commission investigation that the referral list being used by Local 35 had the names of 321 persons, 17 of whom were minority group members, and that the first minority worker listed held position number 85.[3] The Commission representative concluded that strict adherence to the

referral list would prevent referral of a sufficient number of minority electrical workers to City jobs and that Local 35's action directly conflicted with the minority manning provisions of the Hartford affirmative action program.

The City Manager, based on the Commission report, determined that Local 35 was not in compliance with the affidavit it had submitted to secure certification, and the matter was referred to the City's Contract Enforcement Committee. Hearings were held before that body on April 21 and May 28, 1977. On July 7, 1977, the Contract Enforcement Committee issued its decision. The Committee held that strict use of the current referral list with its present make-up "will make compliance with the union's 'Affidavit for Certification' impossible," and that Local 35's "use of the 'out of work' list is clear evidence of lack of good faith effort to comply on the union's part." *In re Local Union 35,* City of Hartford Contract Enforcement Committee, at 4 (July 7, 1977). The Committee concluded that Local 35's noncompliance with its Affidavit of Certification could not be excused.

The Union was put on notice that its continued failure to comply with the commitments in its affidavit and to show a good faith effort to comply would lead to a decertification of the Union. If decertified, the Union can be barred from further participation on construction projects awarded by the City. Ordinance § 2–328. Final action pursuant to the Committee's ruling was held in abeyance pending a ruling by this court in the instant action.

## C. *The Union's Legal Claims*

The Union explicitly does not challenge the legality of the Hartford Affirmative Action Plan itself; the challenge is limited only to the manner in which the Plan is

---

**3.** The following statistics indicate the status of minority and nonminority workers in the Union on February 8, 1977:

| | |
|---|---|
| IBEW No. 35 total membership | – 550 |
| Working | – 229 |
| Not Working | – 321 |

| | |
|---|---|
| Total Minority | – 41 |
| Working | – 24 |
| Not Working | – 17 |

On the rotation list, which contained 321 names, minority workers occupied the following positions: 85, 94, 121, 145, 157, 166, 167, 184, 188, 204, 212, 224, 236, 238, 287, 299, 308.

being implemented against the Union. *See* Hearing on Motion for Preliminary Injunction, August 3, 1977, at 6–8; Plaintiff's Reply Brief to Defendants' Supplemental Memorandum at 4–5.[4] The Union asserts that the implementation of the Plan is unlawful on two grounds. First, the Union argues that the Plan as implemented violates the statutory and constitutional rights of the nonminority individuals who are a part of the Union's referral system. Specifically, the Union contends that the Plan's discriminatory impact on the nonminority members of the Union's referral system violates the rights granted those individuals by the Equal Protection Clause of the fourteenth amendment to the United States Constitution, article 1 of the Connecticut Constitution, 42 U.S.C. § 1981, and 42 U.S.C. § 1983.[5]

Secondly, the Union argues that the Plan as implemented conflicts with constitutional, statutory, and contractual obligations to which the Union claims it must adhere in administering its referral system. The Union claims that in order to comply with the requirements of the Plan, as enforced by the City's Contract Enforcement Committee, the Union would have to jump minorities ahead of nonminorities with respect to referrals from its rotation list and that to

do so would violate state and federal laws prohibiting racial discrimination to which the Union is subject.[6] Though not denominated as such, this in effect is a claim that the Plan's enforcement violates due process in that it requires conduct inconsistent with other laws. In addition, the Union claims that the Plan unlawfully interferes with the Union's contractual rights in its collective bargaining agreement.

At a hearing before the court on August 3, 1977, all parties were of the opinion that no material issues of fact remained in dispute. Decision on the parties' cross-motions for summary judgment was postponed awaiting the United States Supreme Court's decision in *Regents of the University of California v. Bakke,* 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978). Both sides having briefed the effect of that opinion on the present case, the cross-motions for summary judgment are now ripe for decision, in accordance with Rule 56(c) of the Federal Rules of Civil Procedure.[7]

Having reviewed the record before this court, I find no genuine issues of fact in dispute; the controversy can be decided on the law. Since the Union does not here challenge the City's right to adopt the Plan,[8] the legal question presented to this

---

4. For example, counsel for the plaintiff summed up the present posture of the case by stating, *inter alia,* that: "no general attack is being made upon the City's Affirmative Action Plan, and the only challenge being made is as to a specific implementation of that plan." Plaintiff's Reply Brief to Defendants' Supplemental Memorandum at 4.

5. The plaintiff Union claims that the City, through the operation of its Plan, directly and indirectly discriminates against nonminority group persons. First, the Union argues that the City Contract Enforcement Committee's decision to decertify the Union unless it gives preferences to minority members on the rotation list directly discriminates against nonminority members on that list. Secondly, the Union argues that the City indirectly discriminates against nonminority members by exerting pressure on contractors to meet the Plan's 15 percent minority hiring goal, which in turn causes those contractors to seek referrals only of minority persons.

6. In its Complaint, the Union claims that the following statutes prohibit it from giving job referral preference to minority group persons: 42 U.S.C. § 2000e–2(c)(2) ("It shall be an unlawful employment practice for a labor organization . . . [to] refuse to refer for employment any individual . . . because of such individual's race, color, religion, sex, or national origin."); 29 U.S.C. § 158(b) (duty of fair representation); Conn.Gen.Stat. § 31–126(c) (state unfair labor practice for a labor organization to discriminate against any of its members on the basis of race).

7. Also pending is a separate Motion to Dismiss previously filed by the defendants; however, a decision on that motion will be unnecessary in light of the present decision.

8. After disclaiming any challenge to the right of the City to adopt the Affirmative Action Plan, *see* Plaintiff's Reply Brief to Defendants' Sup-

court is a narrow one: whether, consistent with federal and state law, the Plan can be. enforced so as to require the Union to give a preference to minority persons over non-minority persons when referring applicants for employment from the Out of Work List.

## II. *Discussion*

In *Bakke, supra,* the United States Supreme Court gave its approval to affirmative action programs giving preferences to minority group victims of past discrimination

> "where a legislative or administrative body charged with the responsibility made determinations of past discrimination by the industries affected, and fashioned remedies deemed appropriate to rectify the discrimination. *E. g., Contractors Association of Eastern Pennsylvania v. Secretary of Labor,* 442 F.2d 159 (CA3), cert. denied, 404 U.S. 854, 92 S.Ct. 98, 30 L.Ed.2d 95 (1971); *Associated General Contractors of Massachusetts, Inc. v. Altshuler,* 490 F.2d 9 (CA1 1973), cert. denied, 416 U.S. 957, 94 S.Ct. 1971, 40 L.Ed.2d 307 (1974)."

*Bakke, supra,* 438 U.S. at 301, 98 S.Ct. at 2754 (opinion of Powell, J.) (footnote omitted). As the Court stated, "After such findings have been made, the governmental interest in preferring members of the injured groups at the expense of others" is sufficient to justify an affirmative action plan vindicating the rights of the victims.

*Id.* at 307, 98 S.Ct. at 2758. The City of Hartford's Affirmative Action Plan was adopted after the City's legislative body, the Court of Common Council, made explicit findings, based on legislative review and public hearings, that many contractors, labor unions and hiring halls in the building industry in Greater Hartford "have discriminated, and continue to discriminate, against minority group persons and women." Ordinance § 2-322, quoted in full *supra.*[9]

■ As. a threshold matter, plaintiff Local 35 argues that since the City's legislative findings concerned discrimination by contractors and unions in the construction industry *in general,* rather than specific findings as to discrimination in the electrical trade in particular, the City is not justified in applying its Plan to the plaintiff electricians' union. That argument must fall in light of the fact that Justice Powell in *Bakke,* in the passage quoted *supra,* cited with approval *Contractors Association of Eastern Pennsylvania v. Secretary of Labor, supra,* and *Associated General Contractors of Massachusetts, Inc. v. Altshuler, supra.* Both of those cases upheld across-the-board affirmative action programs setting racial quotas for the building trades in specific geographical areas, where the programs were premised upon generalized findings of past discrimination rather than upon specific findings as to each and every union and contractor affected by the program.[10] Thus *Bakke* makes clear that a

---

plemental Memorandum at 4–5, plaintiff, in a brief filed subsequent to the *Bakke* decision, did raise a challenge to the authority of the City to adopt its Plan. *See* Plaintiff's Supplemental Brief Re Bakke at 8–11. In short, the Union now argues that since the operation of the Plan conflicts with Connecticut constitutional and statutory prohibitions of racial discrimination in employment, the City lacked authority to adopt the Plan. *See id.* at 11. Since I have found, *infra,* that the Plan as implemented does not violate state or federal law, the Union's argument here must be rejected.

**9.** The plaintiff does not challenge this finding. *See* Plaintiff's Reply Brief to Defendants' Supplemental Memorandum at 4–5.

**10.** In *Contractors Ass'n,* the Department of Labor had promulgated the "Philadelphia Plan" in

order to implement Executive Order 11246. This Executive Order bars discrimination in federal contracts and requires affirmative action with respect to the hiring and retention of minority workers. Finding that minority craftsmen were underrepresented in the building trades in Philadelphia, 442 F.2d at 163, 173, the Department required that bidders in the Philadelphia region submit affirmative action plans with specific goals for utilizing minority workers. The Third Circuit upheld the program, finding no violation of equal protection or Title VII.

In *Altshuler,* the First Circuit upheld an affirmative action plan promulgated by the Commonwealth of Massachusetts for state supported construction programs. The Massachusetts plan went beyond a federal plan adopted under Executive Order 11246 and required, in

legislative finding of industry-wide discrimination in the construction crafts and trades in the Greater Hartford area gives rise to a governmental interest in vindicating the rights of the injured group which is sufficiently compelling to justify the adoption of an affirmative action program affecting all building contractors and unions working on City contracts in the area.[11]

Given that the Affirmative Action Plan can validly be applied to the plaintiff electrician's union, this court must decide the legal boundaries within which the requirement that the Union use good faith efforts to comply with the 15 percent minority hiring goal on City projects can be enforced against the Union. The Union claims that any enforcement of the Plan which requires that a preference be given to minority workers on its referral list, solely on the basis of race, violates statutory and constitutional prohibitions of racial discrimination against nonminorities. This court is therefore called upon to resolve the legal "tension between the needs of effective enforcement [of an affirmative action plan] and the avoidance of reverse discrimination." *EEOC v. Local 638 . . . Local 28, Sheet Metal Workers,* 532 F.2d 821, 827 (2d Cir. 1976).

## A. *Constitutional Limits on Reverse Discrimination*

First, it is clear that the enforcement of the Plan is not invalid simply because it requires the Union to give preferences to minority workers on the Out of Work List solely on the basis of race. The Second Circuit Court of Appeals in the clearest language recently reaffirmed that

"[i]n employment discrimination cases it is well established that the government's interest in overcoming the disadvantages resulting from past discrimination in employment on account of race is sufficiently compelling to justify a remedy which requires the use of racial preferences." [12]

*Fullilove v. Kreps,* 584 F.2d at 606 (2d Cir. 1978) (footnote omitted). In *Fullilove,* the Second Circuit upheld a federal statute requiring that 10 percent of all federal funds appropriated for specified public works projects be expended for minority business enterprises. The legislatively mandated preference for minority businesses was premised on legislative findings of past discrimination in the construction industry nationwide.

The court in *Fullilove* noted, however, that "[i]n affirmative action programs to remedy the effects of past discrimination the effect of preferring members of the injured groups at the expense of others must be considered." *Id.* at 607. The court continued:

"It is established that in fashioning remedies for past discrimination courts must be sensitive to interests which may be adversely affected by the remedy. The courts, here, as in a number of other areas where legislation for which there is a compelling interest collides with constitutional principles, have adopted an ad hoc balancing test which examines each particular case . . . .. One of the significant limitations on a remedy of 'reverse discrimination' for past discrimina-

---

effect, a 20 percent minority hiring goal. Again, the program was premised on a general administrative finding of underrepresentation of minority workers in the trades. 490 F.2d at 13, 14.

11. The interest of the City is particularly strong here since the construction projects affected by the Affirmative Action Plan are financed by City dollars. Cf. *Fullilove v. Kreps,* 584 F.2d 600, 602 (2d Cir. 1978) (federal affirmative action program involving allocation of federal funds). *See generally, Altshuler, supra; Contractors Association of Eastern Pennsylvania, supra.*

12. The court went on to state:
"The vitality of the rationale in those cases has not [been] disturbed by the recent decision of the Court in *Regents of the University of California v. Bakke, supra.* The Justices did not disagree with the principle that race-conscious remedies can be imposed when there have been judicial, legislative or administrative findings of past discrimination and the remedies fashioned are appropriately drawn to rectify that discrimination. *Id.* 438 U.S. at 302 & n. 41, 98 S.Ct. 2755 (opinion of Powell, J.)."
*Fullilove, supra* at 606–607.

tion is that its effects shall 'not be "identifiable," that is to say, concentrated upon a relatively small ascertainable group of non-minority persons.' *EEOC v. Local 638. . . . Local 28, Sheet Metal Workers*, 532 F.2d 821, 828 (2d Cir. 1976). *See also Kirkland v. New York State Department of Correctional Services*, 520 F.2d 420, 427 (2d Cir. 1975), *cert. denied*, 429 U.S. 823, 97 S.Ct. 73, 50 L.Ed.2d 84 (1976)."

*Fullilove, supra* at 607.

The above-quoted test—that the effects of an affirmative action plan must not be concentrated upon a small ascertainable group of nonminority persons—is a judicially-fashioned limitation on affirmative action remedies in the Second Circuit. This test originated as a limitation on court-imposed remedies under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*,[13] and was applied by *Fullilove* as a limitation on legislative affirmative action plans adopted after findings by the legislature of past discrimination. Since the instant case is analogous to *Fullilove* in that the Hartford Plan was imposed by the City's legislative body on the basis of legislative findings of discrimination in the construction industry, the validity of the remedy enforced upon the Union under the Plan should be judged in light of this "non-identifiability" limitation.[14]

The Union argues that by requiring the giving of a preference to minority workers on the Out of Work List, the City's Plan discriminates against an identifiable group of nonminority persons—*i. e.*, those nonminority persons higher up on the Out of Work List who are skipped over in favor of the minority persons—and therefore directly violates the "non-identifiability" limitation on affirmative action remedies. Though the Union's argument has a surface appeal, a deeper analysis of the Second Circuit case law reveals that the challenged enforcement of the Plan does not exceed permissible limits established in this jurisdiction.

### 1. The Non-Identifiability Limitation

The non-identifiability limitation on affirmative action programs originated in *Kirkland v. New York State Department of Correctional Services, supra*. At issue in *Kirkland* was the legality of a court-imposed quota requiring that at least one out of every four promotions to the position of correction sergeant in the New York State Department of Correctional Services be Black or Hispanic. Prior to *Kirkland*, the Second Circuit Court of Appeals had upheld the imposition of *hiring* quotas to remedy the effects of past discrimination. *See Bridgeport Guardians, Inc. v. Bridgeport Civil Service Commission*, 482 F.2d 1333 (2d Cir. 1973), *cert. denied*, 421 U.S. 991, 95 S.Ct. 1997, 44 L.Ed.2d 481 (1975); *cf. Rios v. Enterprise Association Steamfitters Local 638*, 501 F.2d 622 (2d Cir. 1974) (upholding a minority membership goal imposed upon a union). *Kirkland,* however, distinguished a hiring quota from a promotion quota and held that the promotion quota involved

---

**13.** *See EEOC v. Local 638 . . . Local 28, supra*, 532 F.2d at 828; *Kirkland v. New York State Department of Correctional Services, supra*, 520 F.2d at 427.

**14.** In reality, the "non-identifiability" limitation is the second prong of a two-pronged test for the validity of affirmative action racial quotas in the Second Circuit. Fully stated, the two-pronged test is as follows:

"There must first be a 'clear-cut pattern of long-continued and egregious racial discrimination.' Second, the effect of reverse discrimination must not be 'identifiable,' that is to say, concentrated upon a relatively small, ascertainable group of non-minority persons."

*EEOC v. Local 638 . . . Local 28, supra*, 532 F.2d at 828, *quoting Kirkland, supra*, 520 F.2d at 427. The first prong establishes the justification necessary for an affirmative action plan; the second prong establishes limits on the permissible impact of the plan. The plaintiff Union does not challenge the City's Plan on the ground the Plan was not legally justified. The City's unchallenged legislative findings of past discrimination provide the requisite justification for the Plan. *See Bakke, supra; Fullilove, supra*. The Union argues, however, that the Plan's impact on the Union and its workers exceeds the permissible boundaries set out by the second prong, the "non-identifiability" limitation, of the above test.

there constituted constitutionally impermissible reverse discrimination. 520 F.2d at 429. ·The court reasoned as follows, at 429:

"A hiring quota deals with the public at large, none of whose members can be identified individually in advance. A quota placed upon· a small number of readily identifiable candidates for promotion is an entirely different matter. Both these men and the court know in advance that regardless of their qualifications and standing in a competitive examination, some of them may be by-passed for advancement solely because they are white."

The *Kirkland* court then proceeded to quote the following passage from *Bridgeport Guardians, supra* :

" ' . . . the imposition of [promotion] quotas will obviously discriminate against those Whites who have embarked upon a police career with the expectation of advancement only to be now thwarted because of their color alone. The impact of the quota upon these men would be harsh and can only exacerbate rather than diminish racial attitudes.' "

520 F.2d at 429, *quoting Bridgeport Guardians, supra,* 482 F.2d at 1341.

In *EEOC v. Local 638 . . . Local 28, supra*, the Second Circuit formulated the reasoning of *Kirkland* into a full-fledged test for the imposition of temporary racial quotas:

"[T]he imposition of racial goals is to be tolerated only when . . . the effects of 'reverse discrimination' will be diffused among an unidentifiable group of unknown, potential applicants rather than upon an ascertainable group of easily identifiable persons."

532 F.2d at 828. At issue in *EEOC* was the lawfulness of various remedies ordered by the district court to remedy racially discriminatory membership policies of the defendant union and its apprenticeship training program. Applying the "non-identifiability" test, the Court of Appeals struck down the district court's order requiring

that one of the three members of the Joint Apprenticeship Committee (JAC) overseeing the union apprenticeship program be replaced by a representative of minority descent. The court reasoned that in order to place a minority member on the JAC, one of the three white incumbents would have to be bumped; thus the effects of imposing this racial goal would "fall upon a relatively small, identifiable group of reverse discriminatees"—a result which, the court held, "cannot be justified under the 'non-identifiability' test adopted by this court in *Kirkland.*" 532 F.2d at 830.

The Court of Appeals in *EEOC* did, however, uphold that part of the lower court's order requiring the defendant union and the JAC to attain a 29 percent minority group membership in the union and apprenticeship program by 1981. The court reasoned as follows:

"While we disapprove of a membership goal for the JAC, we affirm the use of such a goal with respect to overall membership in Local 28 and the apprenticeship program. As this court noted in *Kirkland* and *Bridgeport Guardians, Inc., supra*, an entry-level quota has a more diffuse and amorphous effect upon reverse discriminatees than a quota used to bump incumbents or hinder promotion of present members of the work force. An entry-level goal has less ascertainable effect since we cannot readily determine who it is that is being kept out. Accordingly, entry-level goals have less identifiable impact upon reverse discriminatees and are therefore less objectionable as temporary remedies."

532 F.2d at 830.

■ Thus the posture of the law in the Second Circuit is that the effects of past discrimination can be removed by imposing racial preferences at the entry or hiring level but not at the promotion level, based on the rationale that the effects of the former are more diffuse and amorphous, and therefore less objectionable, than the effects of the latter.[15] Given the above

---

15. In *Fullilove v. Kreps, supra*, the court found that the impact of the 10 percent quota for

minority businesses under the Public Works Employment Act of 1977, 42 U.S.C.

posture of the law, this court must focus on the impact of the racial goal imposed upon Local 35's referrals from its Out of Work List.

To recap the pertinent facts, the City's Affirmative Action Plan requires contractors and unions to make good faith efforts to achieve 15 percent minority employment on City construction contracts. The plaintiff, an electricians' union, maintains a hiring hall with several contractors on City projects. The Union keeps an Out of Work List, listing all unemployed electrical workers in the order of the date they register their availability for employment, from which employment referrals are made to contractors. At the time in controversy here, the list was composed of 321 workers, 17 of whom were minority group members. The first minority member on the list was number 85. When the Union refused to skip over nonminority workers on its Out of Work List in order to refer minority workers more quickly to the contractors, the Union was judged by the City not to be in compliance with the Plan's "good faith efforts" obligation and thus subject to disqualification from City contracts. In effect, the City's Plan imposes a racial goal on the Union's referrals from its Out of Work List. The Union contends that since the "victims" of this affirmative action remedy—the nonminority workers passed over on the list—are a small, readily identifiable group, this remedy violates the Second Circuit's non-identifiability test.

### 2. Applying the Non-Identifiability Limitation

A step-by-step analysis reveals that if the Union's argument were accepted, the case law in this circuit upholding racial hiring quotas would be completely undermined. First, it is established law that the City's

Plan can validly require the Hartford area contractors (who are not parties to this action) to give hiring preferences to minority applicants. See discussion supra.[16] In the absence of a union referral system here, the contractors would hire directly from the electrical workers in the public at large. The Union, however, has interposed itself between the contractor and the public pool and acts as a screening agent. That is, the Union is a "middleman" between the hiring contractors and the available work force.

The underlying relationship has never changed, however. The contractor is still hiring from the general public, though now the hiring process is channeled through two stages: first the job applicants go to the Union; next, the Union refers those who come to it to the employers who are seeking to employ qualified workers. The City's Affirmative Action Plan, by requiring that preferences be given to minority persons on the Out of Work List, imposes a racial requirement at the referral stage of the hiring process. Since it is established law that a racial goal imposed at the hiring level does not impermissibly discriminate against nonminority applicants for employment, such a requirement should be able to be imposed at any stage of the hiring process. Otherwise, the policy underlying a hiring-level goal could be thwarted simply by contractors agreeing to hire employees through a union.

Whatever procedure the Union uses to select and refer members of the public for employment must still be subject to the same affirmative action obligations that a contractor hiring directly from the public would be required to meet. The rights allegedly infringed are those of the nonminority applicants for employment. If those rights are not violated when a contractor,

---

§ 6705(f)(2), was so "thinly spread among non-minority businesses comprising 96 percent of the construction industry" that the quota did not violate the "non-identifiability" test of EEOC and Kirkland. Fullilove, supra at 607–08.

16. Legislative findings of past discrimination can justify the imposition of a racial prefer-

ence, see Bakke, supra; Fullilove, supra; and an affirmative racial hiring goal imposed upon contractors does not violate the rights of nonminority applicants for employment, see EEOC v. Local 638 . . . Local 28, supra, 532 F.2d at 830; Kirkland, supra, 520 F.2d at 429; Bridgeport Guardians, supra, 482 F.2d at 1340.

pursuant to an affirmative action plan, gives a direct hiring preference to minority applicants, then those rights are not violated when the Union is required, on behalf of the contractor, to give the preference to minority applicants. When all the sound and fury subsides, it is evident that the affirmative action imposed upon the Union's referral procedure is a valid and constitutional requirement.

Furthermore, a close look at the Second Circuit case law reveals that the Union's interpretation of the non-identifiability test would render that test meaningless. In explaining the rationale for permitting hiring level racial quotas, the court in *Kirkland, supra,* stated: "A hiring quota deals with the public at large, none of whose members can be identified individually *in advance.*" 520 F.2d at 429 (emphasis added). As is implicit in this statement, there is no question that the individual members of the public adversely affected by a hiring level quota can be identified *at a later point in time* —simply by later obtaining all applications and determining the pool of applicants for whom jobs were not available. But since the Second Circuit Court of Appeals has upheld hiring quotas on several occasions, *see* discussion *supra,* the fact that the pool of applicants who are denied jobs can later be identified does not render the racial preference invalid. As the Second Circuit stated in *EEOC, supra,* "[a]n entry-level goal has less ascertainable effect [than a promotion level goal] since we cannot *readily* determine who it is that is being kept out." 532 F.2d at 830 (emphasis added).

■ The consequence of Local 35's use of the Out of Work List is to make identifiable, in advance, the members of the prospective work force who will be disadvantaged by the giving of preference to minority applicants for employment. The Union's referral procedure gathers together in advance the names of the individuals who will be passed over because of the Affirmative Action Plan. The Second Circuit Court surely did not intend to allow its approval of hiring quotas to be frustrated by the ability of private parties to establish a procedure which narrows down the potential number of job applicants to a small, readily identifiable group.

If the Union's interpretation of the non-identifiability test were to prevail, then no hiring level quota could ever withstand that test so long as a private party were able to devise a way in which to identify beforehand the ultimate "victims" of the quota. For the non-identifiability test not to be interpreted so as to thwart the very remedies approved by the court which devised the test, it must be interpreted to mean that the *potential* victims should not be individually identifiable, not that the *actual* victims cannot at some point be identified. For example, the potential victims of a racial hiring quota are all those nonminority members of the public who *may* apply for the affected job; the actual victims are those who *do* apply and are denied a job because of their nonminority status. On the other hand, in a promotion situation, the potential victims, as well as the actual victims, are a more limited group of specific employees who have qualified as eligible for promotion; thus "who it is that is being kept out" by a racial goal at the promotion level is "readily" determinable. *See EEOC, supra,* 532 F.2d at 830; *Kirkland, supra.*

In the instant case, the potential victims of the remedial obligation imposed upon the Union are all those nonminority electrical workers in the general public who may at some point apply for a job on a City construction project; this is not a readily identifiable group of people. The actual victims are identifiable—those nonminority workers on the referral list at the time a preference is given to a minority worker—but this, as discussed *supra,* does not violate the Second Circuit's non-identifiability test. Thus the fact that the Union has narrowed down the pool of electrical workers in the general public to a list of 321 applicants on the Out of Work List does not render an otherwise enforceable remedy unenforceable. To accept the Union's argument would allow the Union, through the operation of its hiring hall, to nullify the City's otherwise lawful

attempt to rectify the vestiges of past discrimination in the construction industry, which is the purpose of a valid racial hiring goal.[17]

■ Moreover, the underlying judicial concern in this area of the law is that the impact on innocent persons of an affirmative action plan not be "inequitable." *See Fullilove, supra* at 607–08. In assessing what is a permissible impact, the court must balance the need for the remedial program against the interests of the individuals adversely affected by the program. *Id.* at 607; *see Hollander v. Sears, Roebuck & Co.,* 450 F.Supp. 496, 505–06 (D.Conn. 1978). As Justice Powell stated in *Bakke, supra,* 438 U.S. at 265, 98 S.Ct. 2733, the concern of the courts is that the remedial action "work the least harm possible" to the innocent individuals who must bear the burden of a justified affirmative action program.

The impact of the plan at issue here is not unduly burdensome on the affected nonminority electrical workers. At the time when this controversy arose, there were 17 minority applicants on Local 35's Out of Work List, accounting for 5.3 percent of the 321 persons on the list. If preferences were given to the minority applicants, the nonminority applicants passed over in favor of the former would still remain on the Out of Work List and still be eligible for referral when their turn later arose. Thus these "reverse discriminatees" would not be permanently denied employment, *cf. Bakke, supra,* 438 U.S. at 265, 98 S.Ct. 2733 (affirmative action admissions program "totally foreclosed" certain applicants from admissions to the university); rather they would only experience a *delay* in their being referred for employment. Such an impact is neither overly severe nor lasting.

Furthermore, applicants on plaintiff's Out of Work List are not ranked according to seniority nor according to scores on a job-related test; the applicants are simply ranked in the order in which they register their availability for employment. These applicants know from the start that they will have to wait an indefinite period of time before they will be referred for employment; as a result of the Hartford Plan, that indefinite period of time would be somewhat longer for the nonminority applicants. It is clear, therefore, that the reasonable expectations of the nonminority applicants would only be minimally affected by the Plan. That being the case, the burden which the Plan imposes upon them is not unduly onerous. *See Fullilove, supra* at 607–08 (where the "reasonable expectations" of the nonminority contractors were only "minimal[ly]" frustrated by the 10 percent set-aside for minority contractors under the Public Works Employment Act of 1977, the set-aside was upheld as not imposing "inequitable results").

In *Fullilove* the court concluded, at 608: "Considering that nonminority businesses have benefited in the past by not having to compete against minority businesses, it is not inequitable to exclude them from competing for this relatively small amount of business" set aside for minority enterprises. Likewise here, considering that nonminority applicants for employment in the construction industry have benefited in the past by not having to compete against minority applicants, it is not inequitable to delay their being referred for employment in order to meet the 15 percent minority hiring goal of the Hartford Plan.

For all of the foregoing reasons, I hold that the Plan's requirement that a preference be given to minority applicants on the Out of Work List does not violate the rights of the nonminority individuals represented by the Union. Accordingly, summary judgment must be granted for the defendants as to the Union's claims under the Equal Protection Clause of the fourteenth amend-

17. This is not meant to imply that the Union deliberately seeks to thwart the City's Plan; however, intentional or unintentional, that would be the result of accepting the Union's legal position.

ment of the United States Constitution, 42 U.S.C. § 1981, and 42 U.S.C. § 1983.[18]

### B. *Conflict with Other Union Obligations*

Having decided that the challenged enforcement of the City's Plan does not violate the constitutional rights of nonminority persons on the Union's Out of Work List, I now proceed to plaintiff's other major legal claims: (1) that the Plan as enforced requires the Union to violate federal and state employment laws prohibiting discrimination on the basis of race, and (2) that the Plan as enforced constitutes an unlawful interference with the Union's contractual rights.

■ The Union contends that the City's Plan, by requiring the Union to give priority to minority workers on the referral list, forces the Union to violate statutory obligations it owes to the nonminority individuals on the referral list. The Union argues that it is forced to violate section 703(c) of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2(c)(2), which provides:

"It shall be an unlawful employment practice for a labor organization—

(2) to . . . fail or refuse to refer for employment any individual . . because of such individual's race, color, religion, sex, or national origin."

A similar argument was made and rejected in *Contractors Association of Eastern Pennsylvania v. Secretary of Labor,* 442 F.2d 159 (3d Cir.), *cert. denied,* 404 U.S. 854, 92 S.Ct. 98, 30 L.Ed.2d 95 (1971). In that case, contractors challenged a legislatively imposed affirmative action plan (the Philadelphia Plan) mandating a minority hiring quota on the ground, *inter alia,* that the quota forced them to violate section 703(a) of Title VII, 42 U.S.C. § 2000e–2(a). Sec-

tion 703(a) imposes on employers a parallel obligation to that imposed by section 703(c) on unions. Section 703(a) provides:

"It shall be an unlawful employment practice for an employer—
(1) to fail or refuse to hire . . . any individual . . . because of such individual's race, color, religion, sex, or national origin."

42 U.S.C. § 2000e–2(a). The Third Circuit held that the Philadelphia Plan's hiring quota did not violate the Title VII provision making it an unlawful employment practice to refuse to hire an individual on the basis of race:

"To read § 703(a) in the manner suggested by the plaintiffs we would have to attribute to Congress the intention to freeze the status quo and to foreclose remedial action under other authority designed to overcome existing evils. We discern no such intention either from the language of the statute or from its legislative history. . . .

. . . It has been said respecting Title VII that 'Congress did not intend to freeze an entire generation of Negro employees into discriminatory patterns that existed before the Act.' *Quarles v. Philip Morris, Inc., supra,* 279 F.Supp. 505 at 514."

442 F.2d at 173.

For reasons identical to those stated by the Third Circuit, I hold that section 703(c) of Title VII is not violated when the Union gives a preference to minority workers on its referral list in order to comply with the City's Plan. To hold otherwise would "freeze the status quo" since virtually any remedial action designed by the legislature to reverse the effects of past discrimination would be prohibited by Title VII—a result clearly not intended by Congress in enact-

---

18. The Union's state constitutional claims must fall in tandem with their federal constitutional claims. Section 8 (due process of law) and section 20 (equal protection clause) of article I of the Connecticut Constitution have been held to have substantially the same meaning as the

due process and equal protection clauses of the federal Constitution. *Snyder v. Town of Newton,* 147 Conn. 374, 381, 161 A.2d 770 (1960). There being no violation of the federal Constitution, I find no violation of the Connecticut Constitution.

ing that title of the Civil Rights Act of 1964. *See Franks v. Bowman Transportation Co.*, 424 U.S. 747, 762–63, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976). On the same basis, the parallel Connecticut state law prohibiting union discrimination on the basis of race, Conn.Gen.Stat. § 31–126(c), cannot be read so as to prevent the City of Hartford from attempting to remedy the effects of past discrimination in the Hartford-area construction industry, absent any showing that the Connecticut legislature intended to foreclose such otherwise valid remedial action.

■ The Union next claims that the implementation of the Plan unlawfully interferes with the Union's contractual rights with respect to the exclusive Union referral system to which the Union and various contractors have bound themselves in a collective bargaining agreement. In order to be certified to work on City construction projects, Local 35 voluntarily agreed to be subject to the Hartford Plan, including the requirement that the Union make good faith efforts to comply with the 15 percent minority hiring goal. The Union, therefore, had the choice of not referring its workers for jobs on City construction projects at all if it was unwilling to take the risk that full compliance with the City's Plan did not violate its contractual obligations. The fact that the manner in which the Union operates its hiring hall may conflict with the requirements of the Plan is not a legal ground for invalidating those requirements. *See Contractors Association of Eastern Pennsylvania v. Secretary of Labor, supra,* 442 F.2d at 174.

In *Contractors Association,* the interested unions, by way of amici brief, joined with the plaintiff contractors in arguing that the minority hiring quota imposed by the Philadelphia Plan unlawfully interfered with the exclusive hiring hall contracts entered into by the unions and the contractors. *Id.* at 172. The court convincingly rejected that claim by stating:

"It is clear that while hiring hall arrangements are permitted by federal law they are not required. . . . *If the [affirmative action] Plan violates neither the Constitution nor federal law, the fact that its contractual provisions may be at variance with other contractual undertakings of the contractor is legally irrelevant.*"

442 F.2d at 174 (emphasis added). If the Union's argument here were to prevail, the Union, through a private contract, would be allowed to obligate itself to violate a valid affirmative action plan. Since union rules and contracts are not superior to the law of the land, the Union's argument must be rejected.[19]

■ The Union also claims that compliance with the Hartford Plan would force it to violate its duty of fair representation of all employees regardless of race, which, the Union contends, would be an unfair labor practice prohibited by section 8(b) of the National Labor Relations Act, 29 U.S.C. § 158(b). If a nonminority electrical worker were to bring an unfair labor practice suit against the Union claiming discriminatory treatment, or were to attempt to bring a breach of contract suit claiming that the Union violated its obligations under the referral procedure, the duties of the Union would be interpreted by the National Labor Relations Board in accordance with governing federal law. *See Amalgamated Association of Street, Electric Railway & Motor Coach Employees of America v. Lockridge,* 403 U.S. 274, 284–91, 91 S.Ct. 1909, 29 L.Ed.2d 473 (1971). Since the City's legislatively imposed preference for minority workers on the Out of Work List is perfectly lawful, *see* discussion *supra,* the Union's compliance with that Plan would be justified under federal law. As with the Title VII limitation discussed *supra,* if the National Labor Relations Act were held to be violated by the Union's compliance with a lawful affirmative action plan, the NLRA would "freeze the status quo" and "fore-

19. Accordingly, plaintiff's pendent state law claim that the City's actions constitute tortious infringement of the Union's property right in its collective bargaining agreement must be rejected.

close remedial action . . . designed to overcome existing evils." *Cf. Contractors Association of Eastern Pennsylvania, supra,* 442 F.2d at 173 (Title VII). There is no indication that the NLRA was intended to have that effect. Thus the Union's compliance with the City's Plan would not constitute an unfair labor practice.

For all of the foregoing reasons, the enforcement of the Hartford Affirmative Action Plan neither violates the rights of non-minority electrical workers represented by the Union nor requires the Union to violate the law. Accordingly, the Union's challenge to the Plan is defeated, and the defendants are entitled to judgment as a matter of law pursuant to Rule 56(c) of the Federal Rules of Civil Procedure.

SO ORDERED.