Jacob Markowitz, J.
Petitioners in this article 78 CPLR proceeding seek to compel respondent, a labor organization, to admit the petitioners to its membership.
Respondent is the sole collective bargaining agent for stagehand and stage maintenance workers employed in the counties of Bronx and New York. Petitioners have been employed as-stagehands and stage maintenance workers for a period of many years. Since the union operates under a “ closed shop ” arrangement with the employers, petitioners are required to pay 4% of their gross earnings as an assessment for the privilege of pursuing this employment. From time to time their employment is terminated or curtailed in favor of a member of the respondent union.
*335 In addition, because of their regular albeit constantly interrupted employment in the industry, petitioners are beneficiaries of the union pension fund. However, if a member of said fund fails to earn at least $4,000 from contributing employers in each calendar year, his eligibility ceases. It appears that this is what happened to these petitioners in 1965.
Petitioners have applied for admission to the union, but their applications have been rejected due to a practice of favoritism because of family affiliation, whereby membership is open only to sons or close relatives. Because of age restrictions, they are ineligible for the apprenticeship program of the union, which is the only other avenue to membership.
It appears to be the law in this State that absent special legislation to the contrary (see Civil Sights Law, § 43) a labor union, like a voluntary association, has complete freedom of choice in regard to its membership and may reject applications for membership for any reason it deems sufficient, without any interference by the courts (Simons v. Berry, 210 App. Div. 90). This appears to be so even though the exclusion from the union may prevent an individual from obtaining; employment because of a “closed shop ” contract between the union and employers (Ryan v. Simons, 277 App. Div. 1000, affd. 302 N. Y. 742, cert, den. 342 U. S. 897; Matter of Miller v. Ruehl, 166 Misc. 479).
The rationale behind this rule was stated in Frank v. National Alliance of Bill Posters (89 N. J. L. 380, 381) as follows: “ It would be quite impracticable for the courts to undertake to compel men to receive into their social relationships one who was personally disagreeable whether for a g’ood or a bad reason. Property rights the courts can deal with; rights in an incorporated company are of that character, and the right of membership is ordinarily assignable. Voluntary associations are quite different. The courts can deal with property rights of such associations, if there are any, while they cannot by a mandatory writ intrude one man’s companionship on another. To attempt to do so would be unavailing as it would lead only to the disintegration of the association.” See Matter of Miller v. Ruehl, supra, for a statement to a similar effect.)
While the general proposition that a union, like any other voluntary association, is free in the absence of special legislation to the contrary, to choose its members and to reject applications without judicial interference, has almost universal acceptance, many jurisdictions have refused to extend its application, even in the absence of a statute, to situations where a labor union holds a monopoly in the supply of labor in the locality, or attempts to maintain both a closed shop and an arbi *336 trarily closed union. Thus, in Wilson v. Newspaper & Mail Deliverers’ Union (123 N. J. Eq. 347) the complainant was denied membership in a union which had entered into a closed shop arrangement with substantially all the employers in the industry, including the employer for whom the complainant had been working prior to the negotiations with the union. The sole ground assigned by the union for denying membership was that its books were closed by reason of the fact that many members in good standing were unemployed. The court granted the relief sought, stating (pp. 350-351): “ The question presented in the instant case is not one of prices or of serving the public but one of employment — the right of a man to sell his own labor. However, the principle is the same; the holders of the monopoly must not exercise their power in an arbitrary, unreasonable manner so as to bring injury to others. The nature of the monopoly determines the nature of the duty. Everyone must be left free to pursue hi's lawful calling; that is fundamental. It seems to me necessarily to follow that the union must either surrender its monopoly or else admit to membership all qualified persons who desire to carry on the trade of magazine mailers. Otherwise, such persons are, by the act of the union, deprived of the right to a livelihood. * * * A union may restrict its membership at pleasure; it may, under certain conditions, lawfully contract with the employers that all work shall be given to its members. But it cavmot do both.” (Emphasis supplied.) (See, also, James v. Marinship Corp., 25 Cal. 2d 721.)
The Restatement of Torts, while recognizing that “Restriction of employment * * * to workers who are members of a labor union * * * is a proper object of concerted action by * # * employees ” (§ 788), carefully indicates that when “ a demand for restriction does not involve either securing of work for union employees or the maintenance or increase of union membership # * but is directed toward the establishment of a monopoly privilege in a group of present members of the union to the exclusion, of everyone else ” it is not within the rule enunciated (§ 788, comment c). Some States have adopted statutes designed to combat unreasonable refusal by unions to admit certain persons into membership (Wisconsin Employment Peace Act, L. 1939, ch. 57; Pennsylvania State Labor Relations Act, L. 1937, No. 294, as amd.).
In the matter at bar, not only has respondent engaged in arbitrary admission and monopolistic practices, but it has added to the odium of its acts by further courses of conduct which compel rectification by the courts. For years it has exacted *337 tribute from petitioners, in the form of a 4% assessment, just for the privilege of being allowed to work, often at lower pay scales, without the concomitant benefits, protection, or security afforded to its members. In addition, its arbitrary refusal to admit petitioners into membership has either effectuated, or threatens to effectuate, a divestment of their pension fund benefits. It has been held by this court that • “ Contributions made to a welfare fund, as well as the reserve accumulated therefrom, actually constitute a portion of the compensation of the employees on whose behalf they are made í? ° s Because such funds are trust funds, however, the participating employees have only an equitable interest in the reserve, as beneficiaries of the trust, and have no right to have any part of the reserve paid over to them directly. Nevertheless, that equitable interest is a substantial one ” (Nicoletti v. Essenfeld, 11 Misc 2d 197, 200). In the instant matter, respondent’s arbitrary restrictions, in effect, have or threaten to cause petitioners to lose valuable equitable rights. This is tantamount to an unconstitutional usurpation of property which cannot be condoned.
Insofar as respondent’s practice of filial preference is concerned, it was stated by this court in State Comm. of Human Rights v. Farrell (43 Misc 2d 958, 965); “ The court recognizes that the practice of giving some preference to applicants with filial ties to members is widespread and dates back to the very inception of craft unions when craftsmen first joined together in guilds. The historic, economic and social reasons for the practice of filial preference and its beneficial effects have been urged by the union and examined by the court.” However, “under the reality of today’s society” and constitutional and legislative guarantees, it was concluded that such practice was illegal, the court adding (p. 966): “In addition to the overriding constitutional and legislative declarations of equality, the court believes that filial preference is contrary to modern day societal objectives concerning job qualifications. No lawyer or doctor today would expect his son to receive preference by reason of family relationship in applying for admission to the Bar or for a medical license. Admission to a profession or industry based exclusively upon the applicant’s qualifications to perform * * as determined by objective criteria is to be encouraged.”
The court is aware of the previous reluctance of the courts of this State to interfere with the internal policies of unions. It is further aware that in a previous decision it questioned the propriety of using the device of mandamus against xmincor *338 porated labor associations, stating: “In view of the clearly articulated purposes and limitations of article 78, however, such considerations as the petitioner puts forward can only be considered to be within the province of the Legislature rather than the judiciary.” (Matter of Mangano v. Altmeyer, 32 Misc 2d 841, 843.)
However, it was also pointed out in that case that (p. 843): “ There is considerable merit to the contention that numerous so-called private bodies in our society exercise a truly public function and are vested with a strong public interest. Among other facts of their operation, the number of people whose rights are affected by the action of such bodies and the official sanction which is given to their operation, whether directly in the form of statutory authorization or indirectly in the form of tax privileges, require their designation as private bodies to be regarded with some reservation.” Modern attitudes require modern approaches. As one court aptly put it:
“ If the characterization of a labor union as a voluntary association becomes in time a mere anachronism, the mere word ‘ voluntary ’ will not likely preserve the present state of the law. Again, it is wise to foresee that a change in surrounding circumstances — such as the economic strengths of competing groups — may make the existing law disjointed and an instrument of oppression if strictly adhered to.
“It is the peculiar genius and strength of the common law that no decision is stare decisis when it has lost its usefulness in our social evolution; it is distinguished, and if times have sufficiently changed, overruled. Judicial opinions do not always preserve the social statics of another generation.” (Carroll v. Local No. 269, International Brotherhood of Electrical Workers, 133 N. J. Eq. 144, 148.)
And, as Professor Teller stated: “ Labor unions which close their ranks to the public thereby assume a sovereignty which is not theirs to assume. * * * The closed shop as an instrumentality of a labor union, membership wherein is reasonably open to the public, establishes a desirable rule governing industrial enterprise. The closed shop at the hands of a labor union which substantially excludes the public from its benefits, on the other hand, is a means whereby an anti-social monopoly is foisted upon the industrial body politic. ” (1 Teller, Labor Disputes and Collective Bargaining, p. 285.)
It is the conclusion of this court that just as the business community must give way to the public policy of the .State with respect to monopolistic practices, just as government is enjoined from committing unreasonable or capricious acts, so, too, must *339 labor unions, as quasi-public organizations, accept that level of maturity and responsibility which compels them, in the public interest, to refrain from arbitrary and unfair actions.
In the matter at bar, not only is it apparent that the respondent by its arbitrary membership policies has distorted the legal and beneficial purposes of the closed shop device of industrial government to effectuate generally anti-social results, but more specifically, it has used this practice to extort assessments from petitioners without corresponding benefits, and to divest petitioners of a valuable property right.
For the foregoing reasons, petitioners’ motion is granted as prayed for, and respondent’s cross motion to dismiss is denied.