Fuchsberg, J.
(dissenting). Because I believe that neither the Governor’s Executive Order No. 45 nor the 1977 Rules and Regulations promulgated on behalf of the Mayor of the City of New York in implementation of the latter’s Executive Order No. 71 constitutes an excessive exercise of executive power, because in my opinion the majority’s reading of Matter of Broidrick v Lindsay (39 NY2d 641) to strike down each of these measures impermissibly narrows the meaning of that decision, and because the net effect of the court’s determination today is to prevent the heads of State and local governments from taking lawful steps toward the realistic enforcement of our strong legal and societal policies against race and sex discrimination, I must vote to reverse in both cases.
By way of preface, since the majority’s nullification of the two executive actions stems from their inclusion of a requirement for "affirmative action”, in articulating my views I think it best to take the scare factor out of that phrase. Though subsuming a broad range of policies and programs that have been introduced at State and Federal levels, "affirmative action” is basically a concept representative of the conviction *380 that full equality of employment opportunity cannot be achieved simply by decrying discrimination or even by decreeing that discrimination cease; rather, it proceeds on the assumption that, unless these are accompanied by positive or "affirmative” steps to speed the elimination of the stubborn vestiges of discrimination, this noxious condition will continue to feed on itself, and the goal of equal opportunity will remain beyond reach.
"Affirmative action”, therefore, contemplates measures such as the reinstatement or upgrading of those who have been discriminated against, the recruitment of members of disadvantaged groups and the opening up of opportunities for attaining vocational skills that will enable them to compete in the labor market. While, at times, impatience with the pace of acceptable methods has led some to resort to quotas and programs of reverse discrimination, concepts quite different from equal opportunity (cf. Alevy v Downstate Med. Center, 39 NY2d 326, 336-337), it is not to be assumed that a program of affirmative action necessarily encompasses preferential treatment (see Matter of Broidrick v Lindsay, 39 NY2d 641, 646-648, supra). The rules and regulations in Broidrick were properly struck down because they did. The executive actions here do not and, thus, are not vulnerable to such attack.
On analysis, in their own way, the executive actions'before us today were but modest attempts to deal with existing inequalities of opportunity. Each recognized that discrimination in employment on the part of public contractors adversely affects the costs of public works by, among other things, decreasing the pool of available labor. Both were directed against what had been found to be a "specific” pattern of discrimination infesting the building and construction industry (Matter of State Comm. for Human Rights v Farrell, 43 Misc 2d 958, 960; see Fullilove v Kreps, 584 F2d 600, 606, cert granted 441 US 960; Equal Employment Opportunity Comm. v Local 638, 532 F2d 821, affd as mod 565 F2d 31; Rios v Enterprise Assn. Steamfitters, Local No. 638, 501 F2d 622). Both had as their aim simply to make the industry more responsive to its obligations as regards the employment rights of minority and female workers.
For his part, the Governor acted pursuant to his constitutional authority (NY Const, art IV, § 3) to see to the faithful execution of our laws and to specify terms and conditions of contracts entered into by the State. In this tenor, Executive *381 Order No. 45 required that all State contracts include a provision incorporating a program that would insure that employees or applicants "are afforded equal employment opportunities.” To allow the contractors flexibility, the order did not spell out precise requirements, except to indicate the program was to be one "to achieve goals and timetables designed to reflect adequate utilization of minority group persons and women”. Instead, it set up an Office of State Contract Compliance (OSCC) within the State Division of Human Rights, the agency already charged by the Legislature with the implementation of antidiscrimination laws. The OSCC was commissioned to develop and enforce appropriate contract terms designed to effectuate the order (9 NYCRR 3.45).
No terms had been issued by the OSCC by the time the petitioners, as representatives of employers and unions in the construction industry, commenced this article 78 proceeding. There was, therefore, no reason to assume that, when issued, the "goals” and "timetables” would not be ones directed at the undisputably permissible goal of attracting qualified minority applicants, rather than granting some form of blunderbuss preferential treatment to minorities and women in the potential labor market. In particular, especially in the light of the Broidrick guidelines, nothing compelled the conclusion that a fixed percentage or quota formula would be imposed.
As for the city, the rules and regulations here challenged were promulgated for the Mayor by his city administrator. Their issuance was authorized by Mayoral Executive Order No. 71, which, undisturbed by Broidrick and with seeming uncontestability, declared it the policy of the city to insure that employment of qualified persons on municipal contracts be free from discrimination on account of race, creed, color or national origin (and, by later amendment, of sex and age). The rules at issue replaced an earlier set that had been struck down by Broidrick as an unconstitutional application of Order No. 71 because they had required contractors to commit themselves to employ specified percentages of minority workers by specified dates on all their construction projects, whether public or private and whether funded by the city or not.
The new regulations carefully avoided these pitfalls. While they called upon each construction contractor to submit a proposed program containing specific steps and actions which, *382 if diligently applied, could be expected to result in employment opportunities substantially equivalent to minority representation in the available work force, they were made applicable only to city and city-assisted construction contracts. Moreover, failure to achieve an anticipated goal was to bring no automatic imposition of sanctions, but instead would occasion review, opportunity for explanation and, where necessary, modification. On such review, lack of progress was to be but a factor in determining whether the efforts to apply the employer’s program had been carried out in good faith.
Furthermore, neither the contractor nor the city were left to flounder in structuring a proposed plan, for the rules indicated that the employer’s program could include provision for notifying relevant labor, minority and community referral agencies and city and State employment agencies of job openings on its city projects; maintaining files containing information on female and minority persons referred to the contractor for employment together with the action that had been taken with respect to their applications; disseminating its Equal Employment Opportunity (EEO) policy within its own organization as well as to subcontractors and suppliers; enlisting the help of minority and other recruitment and training organizations, news media, trade schools and secondary schools within the City of New York; evaluating women and minority personnel for promotion opportunities and encouraging them to seek such opportunities.
As the rules make clear, the idea was to roll back and not to countenance the perpetuation of discrimination. Though race-conscious and sex-conscious, as well they might be if the attitudes and effects engendered by past discrimination were to be addressed in any meaningful way, they did not impose hiring or training quotas or otherwise depart from the principle of merit selection. Indeed, as in the case against the State, the article 78 proceeding mounted against the city pointed to no application of the city’s rules and regulations that would in any guise constitute "a cover for the functional equivalent of a quota system” (University of Cal. Regents v Bakke, 438 US 265, 318; United Steelworkers of Amer. v Weber, 443 US 193) or otherwise violate sound principles against illegal reverse discrimination.
Far from exceeding the bounds of gubernatorial and mayoral power, as an examination of legislative history emphasizes, *383 these executive actions did no more than give effect to the policies, expressed and implied, of the laws of this State. As early as 1945, the then State Commission Against Discrimination was already empowered to direct the taking of "such affirmative action including (but not limited to) hiring, reinstatement or upgrading of employees” (Executive Law, § 132; emphasis mine).[1] By 1962 and 1963, when the commission had been renamed the State Commission for Human Rights (L 1962, ch 165), the Governor was able to announce that $400 million appropriated by the Legislature for State-sponsored contracts would be awarded in conjunction with a program to increase jobs to help assure realization of equality of job opportunities in New York State and towards which there were to be "positive action to promote equality of opportunity” in the construction industry in recruitment, training and employment (Public Papers of Governor Nelson A. Rockefeller [1963], pp 865-866 [emphasis mine]). The same year a new contract form for State contracting agencies, still in use today, required contractors to "take affirmative action * * * [against discrimination because of race, creed, color or national origin] by way of recruitment, employment, job assignment, promotion, upgrading, demotion, transfer, layoff or termination, rates of pay or other forms of compensation, and selection for training or retraining, including apprenticeship and on-the-job training”. (Id., at pp 935-936 [emphasis mine].)
Five years later, in 1968, the legislative revision of the Human Rights Law, in declaring that the purpose of the law was, inter alia, to afford to all citizens "an equal opportunity to enjoy a full and productive life”, spoke in terms of "encouraging] programs designed to insure that every individual shall have an equal opportunity to participate fully in the economic * * * life of the state” free from discrimination in employment (Executive Law,. § 290, subd 3; § 297, subd 4, par c). The following year an amendment authorized the Human Rights Division to work to increase the employment of members of any minority group exhibiting a disproportionately high unemployment rate (L 1969, ch 458, now codified as *384 Executive Law, § 296, subd 12).[2] And, in 1972, echoing this legislative sentiment, the State Department of Labor issued new regulations pursuant to article 23 of the Labor Law described as intended to prohibit "discrimination based on race, creed, color, national origin [and] sex * * * in apprenticeship programs, by requiring affirmative action” (12 NYCRR 600.1 [emphasis mine]).[3]
Executive Order No. 45 followed, along what had thus become a well-blazed trail, on the heels of these and other even more practical expressions of support for such policies, including regular legislative appropriations "for State participation in affirmative action programs”.[4] (Cf. Labor Law, §§ 220-e, 815, subd 5; Civil Rights Law, §§ 40-c, 43). Obviously, it embodies an effort to deal with matters identified by the Legislature as the focus of public concern, and to do so in a manner consistent with State law and public policy. And, certainly no less consonant with the thrust of relevant legislation was the Mayor’s Executive Order No. 71, for it carries forward the unequivocal expression of policy in section 343-8.0 of the Administrative Code of the City of New York, which provides that: "It shall be unlawful for any person engaged in * * * construction * * * pursuant to a contract with the city * * * to refuse to employ or to refuse to continue in any employment any person on account of the race, color or creed of such person.” (Local Laws, 1942, No. 44 of City of New York, eff Sept. 9, 1942.)
On the State level, the executive branch is also authorized by statute to make contracts for the construction, alteration and repair of public buildings and for the procurement of materials, equipment and supplies (State Finance Law, § 163; see Public Buildings Law, § 8). These statutes indicate a *385 legislative policy favoring the setting of standards through which persons dealing or seeking to deal with the State may be furnished with notice of the terms and conditions that attend such relationships as well as some assurance against institutional caprice. It should be apparent, then, that the issuance of an executive order mandating that particular standard provisions and clauses appear in State contracts comes well within the scope of executive authority conferred and contemplated by the statutes.
Apart from this, however, Executive Order No. 45 may be viewed, more fundamentally, as issued pursuant to the constitutionally protected contract-making power that inheres in all "member[s] of this state” (NY Const, art I, § 1). Against the constitutional and statutory backdrop for the exercise of the State’s contracting powers, the executive order would fall well within the range of authority reserved to the executive branch of our State government, and of the Governor as its chief executive officer, to "expedite all such measures as may be resolved upon by the legislature” and, as already indicated, to "take care that the laws are faithfully executed” (NY Const, art IV, § 3).
In addition, I note that the Constitution of the State of New York does not establish a form of government in which the Legislature is supreme (see Matter of La Guardia v Smith, 288 NY 1, 5-6, 10; Matter of Village of Saratoga Springs v Sara-toga Gas, Elec. Light & Power Co., 191 NY 123, 132-138), and, indeed, on the broader plane of American political experience, the actual delineation of power between the executive and the Legislature has never been at all clear-cut, either in theory or in practice. Pertinently, the framers of the Federal Constitution rejected a proposal that would have limited the function of the executive to enforcement of the laws enacted by Congress and instead assigned that office a much more independent role (De Chambrun, The Executive Power in the United States: A Study of Constitutional Law, 111 [1874]).
So, it is recognized that each branch, to protect its own independence, to some extent may exercise inherent powers that, strictly speaking, may be thought to belong to another (see Youngstown Co. v Sawyer, 343 US 579, 637 [Jackson, J., concurring]; Hall, Constitutional Law, p 21). Moreover, as long as it does not contravene a statute, the executive branch may freely enter into contracts on whatever conditions and provisions it deems will best promote the interests of the govern *386 ment (cf. Kern-Limerick, Inc. v Scurlock, 347 US 110; Locke, Second Treatise on Government, § 159), a power that certainly should not be construed in a more limited fashion when its purpose is to eradicate the manifestations of racial discrimination.
The public interest is, in fact, even more directly involved in such a case when, aside from the incalculable importance of social justice to the welfare of the State and Nation, the perpetuation of the problem raises spectres of labor unrest, and of an economy burdened by an economically disenfranchised and unproductive class yet tolerating a restricted labor pool with attendant increases in costs. (See Associated Gen. Contrs. of Mass. v Altshuler, 490 F2d 9, cert den 416 US 957; Farmer v Philadelphia Elec. Co., 329 F2d 3, 8; Brunsfeld & Sons v Board of Educ., 54 Ill App 3d 119; Weiner v Cuyahoga Community Coll. Dist., 19 Ohio St 2d 35; Note, Gubernatorial Executive Orders as Devices for Administrative Direction and Control, 50 Iowa L Rev 78.)
These irresistible bases for Executive Order No. 45 and the rules and regulations before us, we now turn to examine Matter of Broidrick. Carefully read, it supports the State and city in the cases before us on all counts. As though possessed of the prescience that the present litigation would arise in due course, it took care to make clear that discriminatory practices are appropriate areas for "a broad declaration of policy, leaving to the executive discretion to determine the particular otherwise valid means necessary to enforce antidiscriminatory prohibitions”. And, even while it was holding the old city regulations objectionable because they mandated quotas, were unrelated to cost considerations and attempted to impose these dictates beyond city contracts, it recognized that "a policy limited to increasing the pool of eligibles for employment, by including previously excluded minority workers” might well call for an opposite result (39 NY2d, pp 646-647).
Order No. 45 and the 1977 regulations do call for such a result. They do not impose "quotas”. They seek to increase the pool, of previously excluded eligible minority applicants. They apply only to State and State-assisted projects in the one case and city and city-assisted ones in the other. They do not even mandate a rate for accepting minority apprentices. And, though a contractor must make diligent good faith efforts to implement a program, there is no requirement that it hire a specific number of minorities or that parity be reached be *387 tween its work force and the minority work force at large. Finally, an expressed governmental concern in each case is cost minimization and other economic factors related directly to governmental contracts and not to an unrelated extrinsic policy.
For all these reasons, deference to a most compelling State policy and the permissible practices undertaken by those charged with its enforcement require that, in each case, the order of the Appellate Division be reversed and the petition dismissed, or, in the alternative, on conversion of the proceedings to actions for declaratory judgment, that there be declarations that Order No. 45 and the 1977 rules and regulations are constitutional.
Chief Judge Cooke and Judges Jasen, Gabrielli, Jones and Wachtler concur in Per Curiam opinion; Judge Fuchsberg dissents and votes to reverse in a separate opinion in which Judge Meyer concurs.
Order affirmed, without costs.

. The term "affirmative action” was already part of the remedial provisions in Federal and State labor relations‘laws. (49 US Stat 449; US Code, tit 29, § 151; Labor Law, § 700.) Interpretations of those statutes were relied upon in the drafting of the Law Against Discrimination. (See Report of the New York State Temporary Commission Against Discrimination, NY Legis Doc, 1945, No. 6, pp 19, 33.)

. Some conception of the serious extent of the disproportionality, both then and now, may be garnered from State Profile of Employment and Unemployment, 1977 (Washington DC, US Bureau of Labor Statistics, 1978); Foner, Organized Labor and the Black Worker, 1619-1973.

. The regulations go on to state: “Affirmative action is not mere passive nondiscrimination. It includes procedures, methods and programs for the identification, positive recruitment, training and motivation of present and potential minority and female (minority and nonminority) apprentices. It is action which will equalize opportunity in apprenticeship so as to allow full utilization of the work potential of minorities and women. The overall result to be sought is equal opportunity in apprenticeship for all individuals participating in or seeking entrance to the State’s labor force” (12 NYCRR 600.5[b]).

. (L 1973, ch 50; L 1974, ch 50; L 1975, ch 50; L 1976, ch 50; L 1977, ch 50; L 1978, ch 50.)